522 So.2d 606 (1988)
STATE of Louisiana
v.
Stanley PRAVATA.
No. 87 KA 0987.
Court of Appeal of Louisiana, First Circuit.
February 23, 1988.
As Corrected on Denial of Rehearing April 5, 1988.
*608 William R. Campbell, Jr., New Orleans, Walter Reed, Dist. Atty., Parish of St. Tammany, Covington, for the State.
John R. Simmons, Office of Indigent Defender, Covington, for appellant.
Before SHORTESS, LANIER and CRAIN, JJ.
CRAIN, Judge.
Stanley Pravata was indicted by the St. Tammany Parish Grand Jury for two counts of first degree murder, in violation of La.R.S. 14:30. Defendant entered the dual plea of not guilty and not guilty by reason of insanity. He was tried by a jury, which convicted him as charged. In the sentencing phase of the bifurcated trial, the jury was unable to agree upon the appropriate sentence; and, thus, no recommendation was reported to the trial court. Thereafter, in accordance with La.C.Cr.P. art. 905.8, the trial court imposed two concurrent sentences of life imprisonment at hard labor, without benefit of probation, parole or suspension of sentence. Defendant appealed, alleging twelve assignments of error and briefing six in five arguments. In his brief, defendant expressly abandoned assignments of error 1, 3, 4, 5, 9, and 10.

FACTS
Defendant was charged with the deaths of Cheryl Guillory, his former girlfriend, and L.O. (Lance) Davis, a friend of Ms. Guillory. Both of the victims were killed in Ms. Guillory's apartment, shot with a .38 caliber firearm. Davis was shot twice; one bullet entered his body from the back, and the second penetrated the left side of his chest. Ms. Guillory was shot once, through the left side of her chest.
The offense occurred on Sunday, April 28, 1985. Their deaths were discovered the following day, when a co-worker of Ms. Guillory notified her family that she had failed to report to work. Ms. Guillory's mother and stepfather went to her apartment in Slidell, Louisiana, but were unable to obtain a response from her. After noting that Ms. Guillory's car was parked near the building, her parents summoned the St. Tammany Parish Sheriff's Office. The deputy who responded to the call requested the manager of the apartment complex to open the door and, upon gaining entry in the apartment, found the bodies of the victims.
Investigation revealed that the front door of the apartment had been forcibly opened, evidenced by a depression in the wall where it was struck by the doorknob, and that a glass table top had been shattered. Various stains and smears of blood were found near the bodies of the victims and on the inside of the front door. A fingerprint found in a blood stain on the door was positively identified as having been made by defendant.
Defendant was arrested at his home in Pearl River, Louisiana. Thereafter, he gave a statement to investigating officers in which he admitted that he shot the victims during an altercation with Davis. Defendant further stated that he fled the scene after the shootings and that he threw the gun into Lake Pontchartrain on his way *609 to New Orleans. At some point during his flight, defendant apparently decided to return to his home. After the bodies of the victims were discovered, defendant was arrested and charged with murder.

CAPACITY TO PROCEED
By assignment of error number two, defendant contends that the trial court erred by finding him competent to stand trial. He claims that the expert testimony presented by the defense established that he lacked the capacity to participate in his own defense.
Defendant has a lengthy history of mental instability; and, apparently, he had been hospitalized or sought treatment for this problem at various times over the eight years preceding the murders. Approximately six weeks before the offense, he voluntarily entered Southeast Louisiana Hospital in Mandeville, Louisiana, for treatment of depression caused in part by the termination of his relationship with Ms. Guillory. Defendant was discharged seventeen days before the victims were killed.
Shortly after his arrest, defendant filed a pre-trial motion for the appointment of a sanity commission, claiming that he lacked the ability to assist counsel with his defense. Drs. Albert DeVillier and Thomas Healy, who performed the examination approximately one month after the offenses, found evidence that defendant possessed the ability to assist in his own defense; and, noting the strength of these reports, at the sanity hearing defendant stipulated that he was competent.
Several months after his arrest, defendant was again examined after he exhibited self-destructive behavior while incarcerated in the parish prison. Defendant filed a second motion for the appointment of a sanity commission; and the court appointed the same physicians to the commission. Both doctors found that defendant was incompetent to stand trial because he was suicidal and in a psychotic state. Defendant was transferred to Feliciana Forensic Facility.
After defendant was committed to the forensic unit, his attorneys filed a motion to withdraw the plea of not guilty and enter the dual plea of not guilty and not guilty by reason of insanity. Thereafter, the state moved for a hearing to receive evidence relative to defendant's ability to determine right from wrong at the time of the offense. At that time, defendant's mental condition precluded an examination to determine this issue.
Four months after defendant entered Feliciana Forensic Facility, staff doctors notified the court that defendant's condition had improved to the point that he was able to stand trial. The sanity commission, comprised of Drs. DeVillier and Healy, concurred; and the court found defendant competent to proceed. Defendant was returned to the parish prison for trial.
On October 20, 1986, the date trial was scheduled to begin, defendant filed a third motion to determine his competency to stand trial. Dr. DeVillier and Dr. Roger Anastasio were ordered to examine defendant immediately and advise the court of defendant's competency. Both of the doctors reported that defendant was competent to stand trial. Dr. Anastasio further opined that defendant suffered from a paranoia that could prevent him from exploring the range of defenses available to him other than his claim of self-defense, particularly the defense of manslaughter or the possibility of entering a plea to a lesser offense. Because Dr. Anastasio's reservations were admittedly based upon the fact that defendant might be unwilling to assist in these defenses, although able to do so, the court found that defendant was competent to proceed with trial. Since the dual plea had been entered while defendant was committed to the forensic facility, defendant was rearraigned and again entered a plea of not guilty and not guilty by reason of insanity.
Defendant claims that testimony adduced at the lunacy hearings and trial established that he was suffering from a mental defect that prevented him from effectively assisting counsel. He claims this mental defect is further illustrated by the fact that he requested the opportunity to represent himself *610 during the sentencing phase of the trial without the apparent ability to do so.
"Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." La.C.Cr.P. art. 641. Sanity, including mental capacity to proceed, is presumed. La. R.S. 15:432; State v. Edwards, 257 La. 707, 243 So.2d 806 (1971). Defendant has the burden of proving by a clear preponderance of the evidence that as a result of a mental disease or defect he lacks the capacity to understand the proceedings against him or to assist in his defense. State v. Bennett, 345 So.2d 1129 (La.1977), (on rehearing.) While a court is permitted to receive the aid of expert medical testimony on the issue, the ultimate decision of competency is the court's alone. La.C.Cr.P. art. 647; State v. Perry, 502 So.2d 543, 549 (La. 1986), cert. denied, ___ U.S.___, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987). A trial judge's determination of the mental capacity of a defendant is entitled to great weight, and his ruling will not be disturbed in the absence of manifest error. Id.
The trial court did not err in finding that defendant was competent to proceed with trial. The expert testimony introduced by the state established a basis for the court's determination that defendant was competent.
Defendant contends Dr. DeVillier indicated that defendant was not competent to stand trial. To the contrary, Dr. DeVillier advised the court that defendant possessed the competency to proceed with trial and, specifically, that defendant was aware of the defenses available to him and of his rights with regard to trial. Dr. DeVillier testified that defendant was able to relate the facts surrounding the incident to his counsel and understood that he was charged with causing the death of two persons. He further testified that defendant was aware of the penalty exposure he faced as a result of the charges. Thus, defendant's contention that Dr. DeVillier expressed doubts with regard to his mental competency is without basis.
Defendant also contends that the testimony of Drs. Anastasio and Milagros Keh indicated that he was not competent at the time of the trial. As previously noted, Dr. Anastasio was a member of the sanity commission that examined defendant on the date the trial began; and during that hearing he was of the opinion that defendant was competent to stand trial. Dr. Anastasio testified during the sanity hearing that his only concern related to the effect defendant's paranoia might have upon his ability to assess the benefits of a plea to a lesser offense or to assist with a defense other than justification. Although Dr. Anastasio also testified on defendant's behalf during the trial, at that time his testimony concerned defendant's mental condition at the time of the offense. Similarly, Dr. Keh, who examined defendant after his commitment to Feliciana Forensic Facility, also testified at trial; however, she was questioned only as to her opinion regarding defendant's condition at the time of the offense and did not express an opinion with regard to his capacity to proceed with trial.
The record reflects that defendant's mental competency was thoroughly reviewed before the trial began. The expert testimony received by the court was overwhelmingly in favor of defendant's competency. None of the experts who testified indicated that defendant's condition impeded his ability to assist in his defense. We find no error in the court's determination that defendant was competent to stand trial. This assignment of error has no merit.

DENIAL OF RIGHT TO PRESENT DEMONSTRATION
By assignment of error number six, defendant submits that the trial court erred by refusing to permit him to offer a demonstration for the jury. Defendant contends his right to present evidence of self-defense was abridged by the court's refusal to permit his expert witness to demonstrate that the blood found on the front door could have been placed there as a result of a severe cut on defendant's hand.
*611 In their examination of the crime scene, investigating officers discovered four marks on the outside of the apartment door which appeared to be blood. Upon close examination, it was revealed that a clear fingerprint could be obtained from the stain. Serology tests confirmed that the substance was blood and, further, that the blood was Type "A". Through tests performed on the victims and defendant, it was determined that both Karen Guillory and defendant were of Type "O" blood but that L.O. Davis was of Type "A" blood. Fingerprint analysis revealed that the print was that of defendant.
The state argued that the bloody print was made by defendant after he murdered the victims and was the result of defendant's actions in checking Davis's body to make sure that he was dead before closing the door to the apartment. Defendant attempted to show that the blood could have been his own, resulting from a cut on his finger sustained during his fight with Davis and was thus evidence that he acted in self-defense.
In a statement taped shortly after his arrest, defendant claimed that he went to Ms. Guillory's apartment to talk to her. While he was there, he and Davis began to argue, and "something" cut him across his left hand. Defendant claimed that a scuffle ensued between him and Davis and that Ms. Guillory sided with Davis. He stated that he carried a .38 in his pocket that belonged to Ms. Guillory; and, after the struggle began, he started shooting. Defendant related that he then ran from the apartment and began driving to New Orleans, stopping along his way to throw the gun into Lake Pontchartrain.
At trial, defendant presented the testimony of Milton Cox, a forensic chemist, who related his opinion that the pattern of blood was not consistent with the state's theory that the stains resulted from defendant's successive handling of the shirt and the door. Cox also testified that the blood-typing procedure whereby the blood was determined to be Type "A" could have been faulty and, given sufficient time for the test results to develop, a sample that initially appeared to be Type "A" could ultimately prove to be Type "O".
On cross-examination, Cox stated that he could illustrate the blood splatter characteristics by a demonstration in the courtroom. Thereafter, on redirect examination, defendant asked Cox to perform his demonstration. The state objected, arguing that demonstration was not permissible unless defendant first showed that the demonstration was relevant to the events that actually occurred at the scene. The court sustained the objection, noting that the witness had already testified and related his opinion and, moreover, that the demonstration could not approximate the conditions of the crime scene.
Defendant contends that the court abused its discretion in denying him the opportunity to demonstrate blood disbursement characteristics. He argues that Cox's testimony established that the demonstration would not be disruptive and that it could duplicate the conditions of the crime.
"Even a courtroom demonstration by a sworn witness is subject to the requisite foundation of similarity of circumstances...." State v. Ballard, 351 So.2d 484, 488 (La.1977). A trial judge has great discretion in permitting or refusing in-court experiments and demonstrations. State v. Rault, 445 So.2d 1203 (La.1984), cert. denied, ___ U.S. ___, 107 S.Ct. 1987, 95 L.Ed.2d 826. The "[c]riteria for withholding trial permission include considerations arising from the possible disruption of orderly and expeditious proceedings or from the lack of similarity between the courtroom conditions and the actual conditions sought to be re-tested." State v. Mays, 315 So.2d 766, 768 (La.1975). However, the demonstration proposed by defendant was not a simple demonstration of physical characteristics; he sought to scientifically duplicate conditions that were unknown and not susceptible of proof by extrinsic evidence. Contrary to defendant's assertions, Cox did not testify that the experiment could duplicate the characteristics of the crime. Therefore, the court did not err in finding that the conditions for the demonstration *612 could not sufficiently approximate the conditions of the crime scene. The court did not abuse its discretion by refusing to permit defendant to offer the demonstration.

IMPROPER JURY CHARGES
By assignments of error seven and eight, defendant contends that the instructions given by the court to the jury were improper. In assignment of error number seven, defendant argues that the trial court erred by refusing to include a special charge as to circumstantial evidence. By assignment of error number eight, defendant claims that the court erred by including a special charge requested by the state with regard to the inferences to be drawn from the flight of the accused.
"A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given." La.C.Cr.P. art. 807.
Defendant claims that the court's general charge concerning circumstantial evidence was incomplete. The court carefully defined direct and circumstantial evidence before it instructed the jury that, in order to convict on circumstantial evidence alone, the evidence must be strong and convincing enough to exclude every reasonable hypothesis or theory of innocence. However, citing La.R.S. 15:438 and State v. Shapiro, 431 So.2d 372 (La.1983) (on rehearing), defendant contends that he was entitled to an instruction that, as to each element upon which the state relied upon circumstantial evidence, the evidence must exclude every reasonable hypothesis of innocence.
A defendant is entitled to have the trial judge instruct the jurors that the evidence must satisfy them that defendant's guilt has been proved beyond a reasonable doubt and that they must give defendant the benefit of every reasonable doubt arising from the evidence or the lack of evidence. La.C.Cr.P. Art. 804A. In cases involving circumstantial evidence, a defendant is additionally entitled under the provisions of La.R.S. 15:438 ... to have the trial judge instruct the jurors that they must be satisfied the overall evidence "excludes every reasonable hypothesis of innocence".
State v. Captville, 448 So.2d 676, 678 (La. 1984). However, we find no merit to defendant's contention that the court erred by refusing to specially charge the jury that the evidence establishing each element must exclude every reasonable hypothesis of innocence. The essential elements of the charged offenses and verdict responsive thereto were set forth for the jury, and the jurors were instructed that each element must be proved beyond a reasonable doubt. Circumstantial evidence was also defined for the jurors, and they were instructed that the determination of whether or not to rely upon circumstantial evidence and the weight to be accorded to facts proved by such evidence was wholly within the province of the jury. The jurors were further instructed that the circumstances relied upon for conviction must not only be consistent with the defendant's guilt, but inconsistent with every other reasonable hypothesis. We find, therefore, that the special instruction requested by defendant was essentially included within the court's general charge, and the court did not err by refusing defendant's special instruction.
Defendant also contends that the trial court erred by charging the jury that the flight of the defendant may be considered in light of all of the other evidence and that the jurors must decide whether such flight was due to consciousness of guilt or to other reasons unrelated to guilt. Defendant argues the court erred by including this instruction because defendant was arrested at his home the day after the murders; and, thus, the state did not introduce evidence of flight.
Defendant's argument has no merit. In the taped statement provided to law enforcement officers after his arrest, defendant admitted that he ran from the apartment after the shootings and drove toward New Orleans, stopping along the way to dispose of the murder weapon.
*613 This statement was played to the jury. In its legal sense, flight signifies not only a leaving, but a leaving or concealment under a consciousness of guilt and for the purpose of evading arrest. State v. Davies, 350 So.2d 586 (La.1977). Especially in light of defendant's claim that he was unaware of the difference between right and wrong at the time of the offense, defendant's reaction to the crime, including his flight and disposition of evidence, was a relevant factor for the jurors to consider in their assessment of his consciousness of guilt. The issue of flight was, therefore, before the jury; and the court did not err by instructing the jurors that the flight of the accused could be considered for such purposes.

SUFFICIENCY OF THE EVIDENCE
By assignments of error eleven and twelve, defendant submits that the evidence is not sufficient to sustain the verdict. By assignment of error number eleven, defendant argues that the trial court erred by denying his motion for post-verdict judgment of acquittal. By assignment of error number twelve, defendant contends that the evidence presented by the state did not establish a factual basis upon which a rational trier of fact could find guilt beyond a reasonable doubt.
Defendant claims that his defense of insanity was proven by a preponderance of the evidence. He further contends, however, that, even if a reasonable trier of fact could find that the testimony presented does not establish his insanity, mitigating facts were presented which reduce his degree of culpability from first degree murder to manslaughter. Specifically, defendant contends that the evidence shows that he acted in self-defense and without the requisite intent to cause death or great bodily harm.
The state bears the burden of proving beyond a reasonable doubt each element of the crime necessary to constitute the defendant's guilt. La.R.S. 15:271. However, a defendant is presumed sane at the time of the offense; the state is not required to prove sanity. La.R.S. 15:432; State v. Weber, 364 So.2d 952 (La. 1978). A defendant who wishes to negate the presumption must put forth an affirmative defense of insanity and prove his insanity by a preponderance of the evidence. La.C.Cr.P. art. 652. In order to establish that he should be exempt from criminal responsibility, the defendant must show that because of a mental disease or mental defect he was incapable of distinguishing between right and wrong with reference to the conduct in question. La.R.S. 14:14.
Defendant claims that the testimony of Drs. Milagros Keh and Roger Anastasio proved that he was insane at the time of the offense. Dr. Keh testified that she treated defendant for recurrent depression while he was committed to the Feliciana Forensic Facility between February and August, 1986. Dr. Keh was of the opinion that defendant might suffer some impairment to his judgment if he were attacked, during which time he might act under an "emergency discontrol syndrome." However, Dr. Keh noted that actions under an emergency discontrol syndrome are those of impulsive derivation, that is, made without thought of the consequences. Dr. Keh further related that this impairment of judgment would not affect defendant's ability to distinguish between right and wrong. Moreover, Dr. Keh testified that her opinion was based upon the history related by defendant, without a determination of whether or not that history was valid.
Dr. Anastasio testified that he had examined defendant only once, on the date trial began. In his opinion, defendant suffered from a mood problem that prevented rational thought. Although Dr. Anastasio testified that defendant might not have known the difference between right and wrong at the time of the offense, he indicated that this opinion was based upon the fact that defendant could have believed that he was in danger and acted accordingly, although his belief was not necessarily rational.
Thus, neither of the two experts upon whose testimony defendant relies were able to conclusively eliminate the possibility that defendant was not able to distinguish between *614 right and wrong at the time of the offense. In rebuttal, the state presented the testimony of Dr. DeVillier, who examined defendant within two days of his arrest and participated in each of the lunacy commissions appointed by the court, and Dr. Frank Hava, a psychiatrist who treated defendant at Southeast Hospital for one month, beginning approximately six weeks before the incident. Dr. DeVillier testified that, in his opinion (based upon approximately twenty examinations of defendant since his arrest), defendant was able to understand the difference between right and wrong at the time of the offense. Dr. Hava testified that, based upon defendant's conduct during his hospitalization, he did not believe that defendant would have been unable to distinguish between right and wrong seventeen days after his release and that the condition for which defendant was hospitalized would not have prevented him from being able to make that distinction.
The question of whether or not defendant has affirmatively proved his insanity and should not be held responsible for his actions is one for the jury. State v. Marmillion, 339 So.2d 788 (La.1976); State v. Heath, 447 So.2d 570 (La.App. 1st Cir.), writ denied, 448 So.2d 1302 (La.1984). All of the evidence, including both expert and lay testimony, and the conduct and action of the defendant, should be considered by the jury in determining sanity. Heath, 447 So.2d at 575. When a defendant who affirmatively offered the defense of insanity claims that the record evidence does not support a finding of guilty beyond a reasonable doubt, the standard for review by an appellate court is whether or not any rational fact finder, viewing the evidence in the light most favorable to the prosecution, could conclude that defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense. State v. Claibon, 395 So.2d 770 (La.1981).
The jury was presented substantial evidence upon which it could conclude that defendant did not prove he was insane at the time of the offense. One of the state's experts, based upon substantial contact with defendant, testified to his opinion that defendant was sane. This opinion was not negated by any of the other expert testimony. Moreover, although all of the medical experts were of the opinion that defendant suffered from some mental disability, their diagnoses of the condition, as well as the degree to which his conduct was actually influenced by this illness or defect, differed extensively.
Further, lay testimony presented at the trial indicated that defendant was able to plan and execute the crime, his escape, and the disposition of crucial evidence, thus establishing a basis to infer that he was capable of rational thought and was aware that his conduct was wrong. Testimony by tenants in the apartment complex established that defendant went to Ms. Guillory's building several times in the days preceding the shooting and, apparently, waited in the parking lot for an opportunity to enter the apartment. Defendant armed himself before he went to the apartment. Both of the victims died as the result of a single gunshot wound through the heart, which rendered the victims unconscious in a matter of seconds and caused a rapid death through massive bleeding. Davis was also shot in the back, suffering an injury which ultimately could have resulted in his death over an extended period. Defendant immediately fled the scene. He took the murder weapon with him and disposed of it in a fashion that would prevent future recovery.
In light of the evidence presented by the state, the trier of fact could infer that defendant knew the difference between right and wrong at the time he committed the murders. Therefore, any rational trier of fact could find that defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense.
Defendant also claims that, even if it could be determined that he failed to establish his insanity, his mental condition precluded his ability to form the specific intent to kill. Therefore, he contends he was entitled to an acquittal of the charges or, in *615 the alternative, to a judgment of manslaughter.
Louisiana does not recognize the doctrine of diminished capacity. State v. Jones, 359 So.2d 95 (La.1978), cert. denied, 439 U.S. 1049, 99 S.Ct. 727, 58 L.Ed. 2d 708 (1978). A mental defect or disorder short of legal insanity cannot serve to negate the specific intent and reduce the degree of the crime. Id. at 98. Evidence of defendant's mental condition was presented to the jury for use only in its determination of whether or not he was insane at the time of the offense and was not relevant to its determination of whether or not he shot the victims with the specific intent to cause their death.
Defendant further submits he established that he was attacked by Davis and, thus, the killings were in self-defefense. Moreover, defendant claims that, as a result of his paranoia, he perceived a threat in the actions of the victims and responded to what he believed was an imminent danger.
Although defendant contends that he presented proof that Davis attacked him, the state presented substantial evidence to the contrary, indicating that defendant was the aggressor in the conflict. Darlene Burns, Cheryl Guillory's sister, testified that she stayed with her sister in the apartment on the weekend of the murders. She further testified that when she left, between 5:15 and 5:30 p.m. on the date the incident occurred, nothing was broken in the apartment and the wall near the front door was unmarked. Ms. Burns identified several photographs admitted by the state as depicting her sister's apartment. These photographs show a round depression in the wall behind the front door. Ms. Burns specifically testified that the depression had not been there when she left that evening. One of the investigating officers testified that the circular hole exactly corresponded to the size and placement of the inner doorknob and that the knob fit into the depression when the door was fully opened. The state contended this mark evidenced a forcible entry into the apartment some time between 5:15 and 5:30 p.m., when Ms. Burns left, and the following afternoon, when the bodies were discovered.
Donald Ginn, one of Ms. Guillory's neighbors, testified that on the day of the murders he heard three explosions that he thought were fireworks, a noise that sounded like a woman's scream, and the sound of breaking glass. Ginn testified that he heard the sounds from inside his apartment as he and his family were having dinner between 6:00 and 7:00 p.m. Ginn specifically testified that he heard the sounds of the explosions before he heard the glass shatter.
Investigating officers discovered a glass table overturned and broken. Defendant contended that Davis attacked him with a shard of the glass and inflicted a gash on his left hand. However, although defendant was treated for a cut after his arrest, there is no evidence that he sustained the wound in the apartment, irrespective of whether or not he was injured in the course of an altercation with Davis. Although defendant presented forensic testimony through which he attempted to show that the blood smears found on the front door resulted from the cut on his hand, the state presented expert testimony to the effect that the blood was of a different type than that of either defendant or Ms. Guillory but was the same type as that of Davis. Moreover, the testimony of Donald Ginn, a completely disinterested witness, established that the table was shattered after the shots were fired and eliminated the possibility that Davis could have attacked defendant with a piece of the broken glass. Finally, in the confession given by defendant one day after the murders, defendant did not indicate that he was attacked. At that time, he stated only that he went to the apartment and a fight occurred between himself and Davis, during which he shot the victims.
When a defendant claims self-defense in a homicide case, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. State v. Garcia, 483 So.2d 953 (La.1986). However, "[a] person who is the aggressor *616 or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La.R.S. 14:21. A homicide is justifiable only "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger...." La.R.S. 14:20(1).
The evidence presented by the state establishes that: (1) the defendant sought out his victims and waited for several days for the opportunity to approach them; (2) defendant forcibly entered the apartment; (3) the defendant was armed when he arrived at the apartment; (4) neither of the victims was armed; (5) one of the victims was shot in the back and the other sustained injuries characteristic of defensive wounds; and (6) both of the victims had retreated to the extent possible and were found in the room furthest from the point of entry.
For appellate purposes, the standard of review of a claim of self-defense is whether or not a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could find beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Matthews, 464 So.2d 298 (La.1985). Any rational trier of fact could find that the circumstantial evidence presented by the state established that defendant was the aggressor in the conflict and, thus, not entitled to claim self-defense. Moreover, even if it could be found that defendant was not the aggressor, any rational trier of fact could find, beyond a reasonable doubt, that defendant did not act in self-defense.
Defendant also contends that, because of his paranoia, he perceived himself to be in danger and acted in response to that threat. However, the evidence presented by the state negated the possibility that defendant could have reasonably believed the killings were necessary to save himself from the danger of losing his life or receiving great bodily harm. "Although there is not an unqualified duty to retreat the possibility of escape is a recognized factor in determining whether or not a defendant had the reasonable belief that deadly force was necessary to avoid the danger." State v. Brown, 414 So.2d 726, 729 (La.1982). Since the bodies of the victims were found in a room as far as possible from the door, the jury could well have inferred that defendant stood between the victims and the door at the time of the shootings and easily could have retreated. Although defendant presented evidence that Karen Guillory usually carried a gun in her purse and, therefore, he might have believed that she would have used the gun against him, the victim was clearly unarmed at the time of the shooting and her gun was later found in another room. Moreover, while evidence of defendant's mental disease or defect is relevant to his ability to distinguish between right and wrong, the fact that he may have perceived his actions to be reasonable because he suffered from a diminished mental capacity is not an appropriate consideration for this court.
Therefore, we find that any rational trier of fact could have found that defendant failed to prove the defense of insanity. We find, as well, that any rational trier of fact could have found that the homicides were not committed in self-defense. These assignments of error have no merit. Defendant's conviction is affirmed.
AFFIRMED.