598 So.2d 430 (1992)
STATE of Louisiana, Appellee,
v.
Ricky D. KNOWLES, Appellant.
No. 23524-KA.
Court of Appeal of Louisiana, Second Circuit.
April 8, 1992.
*432 Teat and Avery by Darrell R. Avery, Jonesboro, for appellant.
Richard Ieyoub, Atty. Gen., Baton Rouge, Walter E. May, Jr., Dist. Atty., Jonesboro, and George H. Meadors, Asst. Dist. Atty., Homer, for appellee.
Before SEXTON, NORRIS and VICTORY, JJ.
SEXTON, Judge.
Defendant, Ricky Knowles, appeals his conviction for second degree murder and the resulting mandatory sentence of life imprisonment at hard labor. We affirm.

FACTS AND PROCEDURAL BACKGROUND
Knowles and the victim were well acquainted. In fact, they were second cousins who had been involved in a sexual relationship for over a year. At the time of the murder, Knowles was 18 and the victim was 14. There is no reference to the victim's size or weight in the record, although photographic exhibits reveal that she appeared to be an average sized 14 year old girl. In comparison, Knowles weighed 210 pounds and was exceptionally strong due to weight lifting and, allegedly, steroid use. Knowles was in the eleventh grade and living with his parents.
In the early afternoon of April 8, 1990, the victim went to Knowles' home. Except for a brief visit by Knowles' aunt and uncle when the victim arrived, they were alone. Knowles testified that soon after she arrived, they had sex in his bedroom. An argument then began. Apparently Knowles had broken a promise to take her to a party the previous night. Knowles stated that after he put his clothes back on and the victim put a towel around herself, she angrily ran into the kitchen and grabbed a knife.
Knowles thought that she was joking and laughed at her, but he stated that she was crying and drew the knife at him. Knowles took the knife away from her and dragged her back to the bedroom. Knowles stated that the victim began beating him and that is when he stabbed her. She fell with the knife still sticking out of her chest. Knowles testified that when the victim attempted to pull the knife out of her chest, he took it from her and stabbed her again.
Although the autopsy shows that the victim had five major stab wounds and several other minor ones, Knowles testified that he cannot remember stabbing her more than twice. According to Knowles, the next thing he remembers is putting her body in a trash can and dragging it across the railroad tracks where he attempted to hide the body underneath a raised building.
*433 Knowles went back to his home and attempted to clean up the bloody mess. After realizing he could not clean all of the blood, Knowles testified that he intentionally cut himself so that he could tell his parents that it was his own blood. Knowles got his aunt to take him to the hospital around 5:30 p.m. where his wound was treated. Knowles initially did not tell anyone what he did.
It was not until the next morning that the victim's body was discovered underneath the neighboring building. Her body was partially nude and covered with stab wounds. She had received a major stab wound to the right side of her face, four major stab wounds to the chest/heart area, major cuts on her hands and six minor puncture wounds on her chest. The autopsy revealed that the cause of death was internal hemorrhaging from the stab wounds to the heart.
Knowles was arrested and charged with second degree murder. Approximately three months after his arrest, defendant filed a motion for a mental examination because of questions regarding his ability to assist in his own defense as well as his state of mind at the time of the offense. A bill of indictment was filed on October 18, 1990, charging defendant with the second degree murder of the victim. That same day, the district court ruled that defendant was capable of proceeding. Defendant pled not guilty to the charged offense.
Knowles subsequently changed his plea to not guilty and not guilty by reason of insanity. After a trial and conviction for second degree murder, Knowles was sentenced to life imprisonment. Knowles now appeals his conviction and sentence claiming that: (1) the verdict is contrary to the law and evidence because he was either intoxicated, insane, or both; (2) the facts and evidence supported only a conviction of manslaughter; (3) certain photographs were erroneously admitted into evidence; (4) expert testimony was beyond the field of Dr. George McCormick's expertise; and (5) the trial court erred by refusing to allow Dr. Paul Ware to testify as to an hypnotic interview of the defendant and erred in denying the introduction of a video tape of the interview.

INTOXICATION AND INSANITY
Knowles claims that the verdict is contrary to the law and evidence. Specifically, Knowles claims that his abuse of anabolic steroids precluded the presence of specific intent and removed his ability to distinguish between right and wrong at the time of the murder. Although Knowles admits that he killed the victim, he claims that he was either intoxicated, insane, or both at the time of the offense.
LSA-R.S. 14:15(2) defines intoxication as a situation where an intoxicated or drugged condition has precluded the presence of specific criminal intent. An element of second degree murder is the specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1. Specific intent is defined as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1).
Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982); State v. Doby, 540 So.2d 1008 (La.App. 2d Cir.1989), writ denied, 544 So.2d 398 (La.1989). The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982); State v. Butler, 322 So.2d 189 (La.1975); State v. Dean, 528 So.2d 679 (La.App. 2d Cir.1988). In reviewing the correctness of such a determination, the court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Huizar, supra.
Knowles claims that his abuse of anabolic steroids precluded the presence of specific *434 intent. Knowles was an avid weight lifter and allegedly began taking steroids about nine months before the murder. At that time he weighed between 120 and 140 pounds and could only bench press 150 pounds. At the time of the murder, he weighed about 210 pounds and could bench press over 300 pounds. A friend from Florida allegedly mailed the steroids to Knowles.
Even though Knowles was in the eleventh grade, he only had a fourth grade math comprehension level and a fifth grade reading level. Dr. Paul Ware, a psychiatrist who was a defense expert, diagnosed Knowles as mildly retarded. Allegedly, Knowles was not aware that he was taking steroids. He testified that he thought he was taking vitamins to help him grow stronger and gain weight. Instead of taking two tablets a day, or ten milligrams, as is normally recommended, he was taking between 40 and 60 milligrams a day. Knowles demonstrated a marked increase in aggressive behavior and temper outbursts after taking the alleged steroids.
Dr. Ware testified that abusive steroid use produces an intoxicated condition which causes aggressive behavior. Excessive use, Dr. Ware stated, can trigger temporary memory lapses and an inability to contain and stop aggressive behavior once it is released. Dr. Ware described Knowles' condition as anabolic steroid intoxication. In Dr. Ware's opinion, Knowles did not know the difference between right and wrong at the time of the murder and therefore could not have formed the specific intent to kill.
Several witnesses for the defense testified that Knowles demonstrated a marked increase in aggressive behavior after he began taking the alleged steroids. Knowles' grades got worse and he got into much more trouble at school. His temper flared easily and often.
Dr. Ware also testified that the intoxicating effects of anabolic steroid abuse subside two to three weeks after use of the drug is terminated. There was conflicting testimony as to when Knowles stopped taking steroids. Knowles initially told Dr. George Seiden, a psychiatrist who examined the defendant as a member of a sanity commission, that he stopped taking steroids one month prior to the murder. Knowles later told Dr. Ware, and testified in open court, that he stopped taking steroids two days prior to the murder.
Dr. Seiden did not agree with Dr. Ware's conclusions. In Dr. Seiden's opinion, Knowles was competent to distinguish between right and wrong at the time of the murder. He based this opinion on his disagreement with Dr. Ware on the intoxicating effects of steroids.
There is other evidence which suggests Knowles had a specific intent to kill and knew what he was doing. Dr. George McCormick, the forensic pathologist who performed the autopsy on the victim, testified that most of the stab wounds were inflicted in a definite pattern in a "killing zone" and indicate an intent to kill. Dr. McCormick stated that if someone is out of control or in a wild rage, the wounds would normally be random. In this case, the victim's most significant wounds were in a small area. The four major stab wounds were in a tight circle all going toward the heart.
Dr. McCormick also testified that the placement of the wounds indicate that the victim was immobile and unable to resist. The location and direction of the major chest wounds indicate an intent to hit the heart. The placement of the wounds are a strong indication that Knowles had a specific intent to kill or inflict great bodily harm.
In State v. Foster, 437 So.2d 309 (La. App. 2d Cir.1983), motion for untimely writ application denied, 440 So.2d 734 (La.1983), the defendant claimed that his alcoholic intoxication precluded the presence of specific intent. The defendant killed his victim by repeatedly striking her on the head with bottles and dishes and by stabbing her in the head with a large kitchen knife. This court held that these facts would permit, and probably compel, a rational trier of fact to infer and find beyond a reasonable doubt that the defendant specifically intended *435 to kill or do great bodily harm to the victim.
In State v. Segura, 464 So.2d 1116 (La. App. 3rd Cir.1985), writ denied, 468 So.2d 1203 (La.1985), the defendant claimed intoxication from a drugged condition. The victim in that case received numerous severe wounds. The court held that the severity and number of wounds supported the conclusion that the defendant had a specific intent to kill.
In the instant case the evidence, when viewed in a light most favorable to the prosecution, supports the conclusion that Knowles had a specific intent to kill the victim. The number and placement of the wounds are not reflective of someone in a wild rage or out of control. Even though Knowles' excessive steroid use may have made him more aggressive and more easily angered, Louisiana does not recognize the doctrine of diminished capacity. A mental defect or disorder short of legal insanity cannot serve to negate the specific intent and reduce the degree of the crime. State v. Jones, 359 So.2d 95 (La.1978), cert. denied, 439 U.S. 1049, 99 S.Ct. 727, 58 L.Ed.2d 708 (1978); State v. Pravata, 522 So.2d 606 (La.App. 1st Cir.1988), writ denied, 531 So.2d 261 (La.1988). Knowles was not intoxicated as required by LSA-R.S. 14:15(2) at the time of the murder.
Knowles also argues that he was insane at the time of the murder. LSA-R.S. 14:14 defines that insanity exists when the circumstances indicate that, because of a mental disease or mental defect, the offender was incapable of distinguishing between right and wrong with reference to the conduct in question.
In Louisiana there is a legal presumption that the defendant is sane and responsible for his actions. A defendant who wishes to negate this presumption must put forth an affirmative defense of insanity and prove his insanity by a preponderance of the evidence. LSA-C.Cr.P. Art. 652.
The question of whether or not a defendant has affirmatively proved his insanity and should not be held responsible for his actions is one for the jury. State v. Marmillion, 339 So.2d 788 (La.1976); State v. Pravata, supra. When a defendant who affirmatively offered the defense of insanity claims that the record evidence does not support a finding of guilty beyond a reasonable doubt, the standard for review by an appellate court is whether or not any rational fact finder, viewing the evidence in the light most favorable to the prosecution, could conclude that the defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense. State v. Claibon, 395 So.2d 770 (La.1981).
As was noted earlier in this opinion, Dr. Seiden testified that, in his opinion, Knowles was capable of distinguishing between right and wrong at the time of the offense. This testimony was in contradiction to Dr. Ware's testimony.
In addition to the strategic placement of the wounds, other evidence which indicates that Knowles was capable of distinguishing between right and wrong at the time of the murder is that he attempted to conceal what he had done. He placed the victim's body in a garbage can and hid it underneath a neighboring building. He then returned to his home and attempted to clean up the blood. Once he realized he could not remove all of it, he cut himself to make it look like it was his blood.
In light of the evidence presented at trial, the trier of fact could conclude that Knowles knew the difference between right and wrong at the time of the murder and thus find that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the murder.

MANSLAUGHTER
Knowles next claims that even if this court finds that he did have specific intent to kill, the evidence shows that the appropriate verdict was manslaughter and not second degree murder. Specifically, Knowles claims that the murder was committed in sudden passion or heat of blood.
*436 LSA-R.S. 14:31 defines manslaughter as a homicide which would be second degree murder, but is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Knowles argues that he was provoked into stabbing the victim when she attacked him with a kitchen knife. Knowles also states that he was more likely and susceptible to fly into a rage than the average person because of his anabolic steroid abuse.
Because the question of provocation is one of fact, the jury must determine whether the offender's blood had actually cooled or whether the average person's blood would have cooled. State v. Rayford, 476 So.2d 961 (La.App. 1st Cir. 1985).
The record reflects that the jury was aware (through the court's instructions) of the possibility that they could return a responsive verdict of manslaughter. However, the jury concluded that this was a case of second degree murder. The jury was free to accept or reject the defendant's version of events. State v. Smith, 490 So.2d 365 (La.App. 1st Cir.1986), writ denied, 494 So.2d 324 (La.1986). The verdict of guilty in this case reflects that the jury concluded either that the victim did not attack Knowles with a knife, or that under the particular circumstances of the case the victim's alleged attack with the knife was not provocation sufficient to deprive an average person of his self-control and cool reflection.
The evidence supports the jury's verdict. The numerous wounds inflicted over various areas of the body, the apparent immobility of the victim at the time of the murder, and the defense type wounds on the victim's hands are inconsistent with heat of blood or sudden passion. See State v. Smith, supra, for a resolution of the same argument under similar circumstances.
When the evidence is viewed in a light most favorable to the prosecution, it is apparent that a rational trier of fact could have concluded beyond a reasonable doubt that Knowles was guilty of second degree murder and not manslaughter.

ADMISSION OF PHOTOGRAPHS
Knowles next argues that the trial court erred in admitting into evidence photographs of the victim which were prejudicial and had no relevancy to any material issue at trial. These five photographs depicted the stab wounds on the victim's body.
The test as to admissibility of photographs of a homicide victim is whether the probative value of the photographs outweighs the prejudice that may result by display to the jury. State v. Michel, 422 So.2d 1115 (La.1982); State v. Bolden, 501 So.2d 942 (La.App. 2d Cir.1987). Photographs of a victim's body are generally relevant to prove corpus delicti, corroborate other evidence concerning the manner in which the death occurred, the severity and number of wounds, and to establish the identity of the victim. State v. Nelson, 459 So.2d 510 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 322, rehearing denied, 472 U.S. 1013, 105 S.Ct. 2715, 86 L.Ed.2d 729 (1985); State v. Bolden, supra.
The photographs in this case were offered to show the number of wounds and their placement. These photographs were helpful in corroborating Dr. McCormick's testimony that the victim's chest wounds were in a tight circle near the heart. The record indicates that the pictures were not overly gruesome. Under these facts, the trial judge was correct in allowing the photographs to be admitted into evidence.

EXPERT TESTIMONY
Knowles argues that the trial court erred in allowing testimony to be presented that was beyond the field of expertise of Dr. McCormick, the forensic pathologist. Specifically, Knowles asserts that Dr. McCormick should not have been able to express his opinion that the concentration of wounds to the chest usually denotes a degree of intent and knowledge of trying to kill someone. There was no objection to this testimony at the time of its occurrence.
*437 An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. LSA-C.Cr.P. Art. 841. A new basis for an objection cannot be raised for the first time on appeal. LSA-C.Cr.P. Art. 841; State v. Cressy, 440 So.2d 141 (La.1983); State v. O'Neal, 501 So.2d 920, 924 (La.App. 2d Cir.1987), writ denied, 505 So.2d 1139 (La. 1987).
Moreover, we note that the conclusion drawn by Dr. McCormick appears to be one which is within the field of forensic pathology, the same field in which the district court found Dr. McCormick to be an expert. The district court appears not to have erred in allowing this testimony.

HYPNOTIC INTERVIEW
Knowles argues that the trial court erred by refusing to allow Dr. Ware to testify about Knowles' hypnotic interview and erred in denying the introduction of a videotape of the interview. Although Knowles did not state what this interview would show, apparently it would give more specific information about the murder.
In determining the appropriateness of allowing hypnotic interviews into evidence, this court in State v. Woodfin, 539 So.2d 645 (La.App. 2d Cir.1989) adopted the following procedural safeguards:
(1) Hypnosis should be conducted by a qualified professional experienced in the use of hypnosis. He should be able to qualify as an expert in order to aid the court in evaluating the procedures followed.
(2) The professional should be independent of and not regularly employed by the prosecution, investigator or defense.
(3) Any information given to the hypnotist by law enforcement personnel or the defense is to be recorded, whether in writing or another suitable form. This is to help the court determine the extent of information the hypnotist could have communicated to the witness either directly or through suggestion.
(4) Before inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them. The hypnotist should carefully avoid influencing the description by asking structured questions or adding new details.
State v. Woodfin, supra at 648-9; see also State v. Holden, 554 So.2d 121 (La.App. 2d Cir.1989), wherein two additional safeguards were established at 126, n. 5.
If the testimony is admissible, the opponents may challenge the reliability of the procedures followed in the particular case with expert testimony at trial, but may not attempt to prove the general unreliability of hypnosis. It is for the trier of fact to then determine the weight to accord the testimony.
The court in Woodfin also stated that the party attempting to introduce the hypnotic testimony has the burden of establishing admissibility by clear and convincing evidence. This heavy burden is justified by the potential for abuse of hypnosis, the genuine likelihood of suggestiveness and error, and the resulting risk of injustice.
Knowles has failed to carry this burden of proof. None of the factors in Woodfin were developed at the time an attempt was made to introduce Dr. Ware's testimony. This trial was held in March of 1991 and Woodfin was rendered in January of 1989, therefore, Knowles should have been aware that this was the standard for admissibility of hypnotic testimony. Knowles failed to make a threshold showing that the hypnotic testimony should have been admitted. There was an attempt to introduce the videotape later in the trial and again when Knowles filed a motion for a new trial. The record reflects that the Woodfin factors were not developed at these times either. Knowles has also not made a showing of what the interview would reveal.
The trial judge did not err in refusing to allow the testimony or a videotape of the interview. Knowles failed to carry his burden of proof that they should have been admitted. This assignment of error is without merit.

*438 CONCLUSION
All of the assignments of error raised by defendant are without merit. The conviction of second degree murder and mandatory sentence of life imprisonment at hard labor without benefit of suspension, probation, or parole is hereby affirmed.
AFFIRMED.