liGASKINS, Judge.
The defendant, Rebecca Carol Sellen, was originally charged with attempted second degree murder for the brutal and life-threatening beating of her infant son. Following a jury trial, she was convicted of attempted manslaughter and sentenced to 20 years at hard labor. She appeals, raising four assignments of error. We affirm the defendant’s conviction and sentence.
FACTS
At approximately 4 p.m. on October 26, 1993, Sergeant Judy Humble of the Monroe Police Department responded to a suspected child abuse case at the emergency room of St. Francis Medical Center in Monroe. Upon her arrival at the hospital, she found emergency personnel attending to the unconscious victim, nine-month-old Tyrell Bennett Sellen, who had significant bruises to his head, nose, chest, and penis, and a burn on the palm of his hand. Sergeant Humble also learned that the defendant, the child’s mother, was in the emergency room waiting room.
The defendant informed Sergeant Humble that she had gone to the store earlier in the day, leaving Tyrell with her boyfriend, Jerome Menyweather. She returned to find Tyrell with his eyes slightly opened, but not moving or breathing. When asked about the possibility of Jerome’s involvement, the de *580 fendant stated, “My boyfriend does not beat my children.”
The defendant then agreed to accompany Sergeant Humble to the police station to give a statement. Prior to taking this statement, which was not recorded, Sergeant Humble advised the defendant of her Miranda rights. The defendant indicated that she understood her rights, waived them, and agreed to talk to Sergeant Humble. According to the defendant, she and her two children, Tyrell and 20-month-old Antonio, were living with her boyfriend Jerome at the Monroe home of Jerome’s grandmother. The two babies slept on a couch in the defendant Rand Jerome’s bedroom. The defendant told Sergeant Hmnble that at about midnight the previous night, Tyrell began crying shortly after Jerome returned home; Jerome had been out all evening without the defendant. The defendant stated that she jumped out of bed, walked over to the couch, and hit Tyrell in the head with her open hand about three times. She then picked him up from the couch, dropped him onto the floor, and changed his diaper. (The room had a cement floor covered by an old shag carpet without any padding.) After Tyrell continued to cry despite being given a bottle, the defendant stated that she jostled him up and down.
Sergeant Humble testified that she also inquired about other injuries Tyrell sustained. The defendant could not explain the presence of the bruise on his penis, but admitted that she had hit Tyrell with his baby bottle in the rib area on his left side. The defendant claimed that the burn on Tyrell’s palm was the result of an accident which occurred when he touched the end of a cigarette she was smoking.
During this statement, the defendant also provided personal background information. The 19-year-old defendant explained that she was originally from Norfolk, Nebraska, where she met Jerome, who was a native of Monroe. In August of 1993, she came to Monroe with Jerome, bringing along her two young sons. (Jerome was not the father of Tyrell or Antonio; their father was inearcer-ated in a Nebraska prison.) The four of them moved into the home of Jerome’s grandmother with several of his relatives.
The defendant stated that after arriving in Monroe, Jerome would constantly go out and leave her with the children, thereby causing her to remain at home and care for them all by herself. As a result, their relationship began to deteriorate, and Jerome had informed her that he was saving money to pay for her and the children Uto return to Nebraska. However, the defendant again indicated that Jerome had never hurt either child.
At the conclusion of the statement, Sergeant Humble returned the defendant to the hospital where Tyrell was undergoing emergency brain surgery. The next day, October 27, Sergeant Hmnble and her partner, Detective Larry Linson, took a recorded statement from the defendant.[1] Sergeant Humble testified that prior to the statement, she again advised the defendant of her Miranda rights. The defendant signed a waiver form of those rights and agreed to answer questions.
During this statement, the defendant explained that she began getting angry at her children after she moved to Monroe with Jerome. She stated that they cried all of the time, and that no one would assist her in caring for them. The defendant admitted that she began hitting Tyrell “hard” on his side with his baby bottle in late August or early September of 1993. The defendant also recounted the events of the night before Tyrell was hospitalized. She stated that because of his continuous screaming and crying, she slapped Tyrell hard three times on the side of his face. She then roughly dropped him on the hard cement floor, jerked off his overalls to change his diaper, and then threw him back on the couch. She also said that during this incident, Jerome left the room because he could hear his cousin, who was in an adjoining room, saying that someone was beating the children; he did not want anyone to think he was the one abusing them. Additionally, she related her account of Tyrell “accidentally” burning his *581 hand when he grabbed a cigarette she was smoking. During this statement, she also said that she felt that if she didn’t have the children, she would be able to do more things and go places |4with Jerome. According to her, it looked bad for Jerome to go places with her children because he wasn’t their father and he had a child of his own.
Following this statement, the defendant was arrested. On the next day, October 28, she gave another recorded statement. Prior to this statement, Sergeant Humble again advised the defendant of her Miranda rights, which the defendant waived. The defendant admitted that she had kicked Tyrell hard in his left side as he was lying on the floor because she was angry about his continuous crying. The defendant stated that when the baby would raise his head while crying, she slapped him on the head with her fingers, knocking his head to the floor. She also had hit him hard with the lower portion of a baby bottle. In relating these incidents, she again described the amount of force used as “hard.” The defendant also recalled one incident where she hit Tyrell on the right side of his back with her fist.
During her statements to Sergeant Humble, the defendant also told the officer that she wondered what it would be like to have only one child because she wasn’t able to go out and do things with two children. She told the officer that when she had only Antonio and lived in Nebraska, she always had relatives who were available and willing to care for him. She also stated that she had let Jerome become more important to her than God and her children.
To the amazement of his neurosurgeon, Tyrell survived. However, he did not regain consciousness for almost a month. Furthermore, the injuries he sustained have had permanent ramifications. He is now retarded, blind, partially deaf, and paralyzed on his right side.
The defendant was originally charged with the attempted first degree murder of Tyrell. The state subsequently amended the bill of information and charged her with attempted second degree murder. Following a jury trial, she was convicted of attempted manslaughter. The trial court sentenced her to twenty | 5years at hard labor with credit for time served, the statutory maximum sentence for this offense. Her timely motion to reconsider sentence was denied.
SUFFICIENCY OF EVIDENCE
The defendant contends that the evidence presented at trial was insufficient to support the verdict of attempted manslaughter. In particular, she contends that the state failed to prove that she possessed the requisite element of specific intent to kill.

Law

The defendant was charged with attempted second degree murder. The jury returned a compromise responsive verdict of attempted manslaughter, as allowed under La.C.Cr.P. Art. 814. If the evidence adduced at trial was sufficient to support a conviction of the charged offense, the jury’s verdict is authorized. State v. Holland, 544 So.2d 461 (La.App. 2d Cir.1989), writ denied, 567 So.2d 93 (La.1990).
A specific intent to kill is an essential element of the crime of attempted second degree murder, and also of the responsive crime of attempted manslaughter. State v. Dean, 528 So.2d 679 (La.App. 2d Cir.1988); State v. Turner, 440 So.2d 834 (LaApp. 2d Cir.1983). A conviction for an attempted offense must rest upon sufficient proof that the offender actively desired to cause the proscribed criminal consequences to follow his act or failure to act and that the offender committed or omitted an act for the purpose and tending directly toward the accomplishing of his object. State v. Dean, supra; La.R.S. 14:10 and 14:27.
Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.982); State v. Knowles, 598 So.2d 430 (La.App. 2d Cir.1992); State v. Doby, 540 So.2d 1008 (La.App. 2d Cir.1989), writ denied, 544 So.2d 398 (La.1989).
*582 The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982); State v. Knowles, supra; State v. Dean, supra. In reviewing the correctness of such a determination, an appellate court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Huizar, supra; State v. Knowles, supra.
This court’s authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. Art. 5, § 5(C); State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987). A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Rogers, supra.

Testimony

The testimony of Jerome Menyweather and his cousin Sonya Menyweather established that, on the night before Tyrell was rushed to the emergency room, the defendant beat the baby. Jerome testified that the defendant approached the crying infant, picked him up, and began hitting him. Jerome indicated that because he was sickened by the defendant’s actions, he left the bedroom and went into an adjoining room. However, he testified that he could still hear the defendant slapping Tyrell “hard.” Sonya verified this, testifying that she could hear the child_|7being struck and that Jerome emerged from the bedroom and told her that the defendant was hitting the baby.
Mona Menyweather, Jerome’s aunt, testified that the next day she took the defendant to the grocery store. Mona did not see Tyrell at that time. When they returned about 20 minutes later, Mona walked into the defendant’s bedroom and saw the children. She commented upon the fact that Tyrell appeared to be sleeping with his eyes open. The defendant laughed and said that sometimes he did that. After Mona went into the living room, the defendant ran from the bedroom with Tyrell, claiming something was wrong with him. He was not breathing at this point. Mona attempted to resuscitate the baby and instructed another relative to telephone for emergency assistance.
After being rushed to the hospital, Tyrell was treated by Dr. Jose Bermudez, a neurosurgeon with a sub-specialty in pediatric neurosurgery, and Dr. John Michael Barraza, a neuroradiologist. Both physicians testified extensively about the multiple injuries Tyrell sustained.
Dr. Bermudez stated that he was called to the emergency room upon Tyrell’s arrival and found that the child was “unconscious, unresponsive, [and had] already lost all the elementary reflexes of his cranial nerves of importance and relevance for a trauma case.” The fact that the baby appeared to be sleeping with his eyes open indicated that his level of consciousness was so depressed that he was losing all tone and ability to control one of the most elementary reflexes to protect the eye or cornea reflex. Dr. Bermudez testified that Tyrell was dying because of the severe and “very massive” injuries to his brain, and emergency measures were taken, including surgery. Dr. Bermudez stated that upon shaving Tyrell’s head to prepare him for surgery, he observed physical signs of bleeding in multiple areas of the brain and found the child’s head to be malformed from the ^presence of multiple subgaleal hemato-mas. The pattern of bruises on his head was suggestive of knuckles or a fist. The baby also had a fracture on the left side of his skull and a black eye. Furthermore, he sustained damage to his optic nerves.
According to Dr. Bermudez, the most serious of Tyrell’s injuries were those inflicted to the brain. Prior to surgery, he diagnosed Tyrell as having an intracranial hemorrhage technically called a subdural hematoma. Dr. Bermudez explained this injury in layman’s terms as hemorrhaging between the covers of the brain and the brain itself. Such an injury is life-threatening because it increases *583 pressure on the brain. As a result, this pressure reaches a level above the heart’s ability to pump blood inside of the brain, causing brain death. He stated that at the time Tyrell was admitted at the hospital, his brain cells had begun to die because of the lack of adequate blood supply. Thus, Dr. Bermudez testified that the surgery was necessary to quickly relieve as much of the pressure as possible. He also indicated that Tyrell’s injuries, particularly the skull fracture, resulted from the use of a “severe” and “tremendous” amount of force. Dr. Bermu-dez further testified that, due to the extreme nature of the baby’s injuries, he never expected the child to survive.
In addition, Tyrell had numerous bruises of different ages throughout his body, including at least seven in the frontal region of the head; thirteen on the left side of the chest and four on the right side; five on the back in the spine and vertebrae area; and one on the tip of his penis. Dr. Bermudez graphically described these injuries, and photographs admitted into evidence at trial depicted them as well (exhibits # S-5, 6, 7, 8, 9,10, 11 & 14). Other injuries included an abrasion to his nose resulting in a complete loss of the skin covering this area[2] andjgburns to the palm of his left hand. As to the hand burn, Dr. Bermudez testified that the magnitude of the burns indicated that they resulted from someone holding the end of a cigarette to the palm for an extended period of time or on multiple occasions as opposed to one accidental touching.
Dr. Bermudez also testified that, according to the medical literature on reported child abuse cases, it was common for an abused child to be held by the neck and struck on the left side by a right-handed assailant. The doctor stated that he found evidence of such conduct in the present case. Tyrell’s major head injuries were on the left side, and Dr. Bermudez observed an abrasion on Ty-rell’s neck, which was indicative of someone holding the baby by the neck. The record also indicated that the defendant was right-handed.
Another doctor at St. Francis Medical Center interpreted Tyrell’s C.T. scans and x-rays. Dr. Barraza, a neuroradiologist, testified that he found extensive injuries of varying age, including the damage to the brain consistent with Dr. Bermudez’s testimony. He observed evidence of old and new bleeding indicating chronic trauma. Dr. Barraza testified that the bleeding in the brain was a typical result of someone having shaken Ty-rell back and forth. He noted that Tyrell also sustained an acute skull fracture.
Dr. Barraza also described injuries observed in Tyrell’s chest and abdomen. He indicated that there was air outside of Ty-rell’s lungs indicating massive, very severe trauma to the chest, which usually results from a direct crushing injury. Dr. Barraza noted fluid in his lungs, multiple rib fractures of varying ages, and a laceration to the liver. He likened Tyrell’s injuries to whiplash and again characterized them as the result of a very severe shaking. He also noted a sub-dural hematoma in the spine, which was also indicative of a very severe shaking injury and implied “very, very severe trauma.” As to this particular injury, he stated that [ iphe had only seen this sort of injury on rare occasion and never before in an infant of Tyrell’s size.
Dr. Barraza further explained the rib fractures Tyrell sustained. He stated that there were fractures of at least four different ages with the oldest being greater than three months old. In number, there were six fractures on the left and five on the right. He characterized some of them as very acute. Dr. Barraza testified that rib fractures were very difficult to induce in young children because their bones have not completely calcified. Thus, he stated that multiple injuries such as those sustained by Tyrell were without question indicative of child abuse. To place the severity of the injuries in context, he explained that the more acute ones would be equivalent to those sustained in an auto *584 accident wherein a person is thrown from and rolled over by the ear.
During the presentation of its case, the state admitted into evidence the numerous statements made by the defendant to the police. The defendant testified in her own defense and again recounted the difficulties she encountered upon moving to Monroe. She admitted to hitting Tyrell because he would not stop crying, but denied she was trying to kill him. The defendant also claimed she never realized the severity of his injuries.
On cross-examination, the defendant testified that she had attended one year of college. She again admitted that she began hitting Tyrell in late August or early September. The defendant stated that, although she noticed bruises on him, she did not take Tyrell to the doctor at that time because she did not think his injuries were bad. She also acknowledged that Tyrell would cry when she picked him up underneath his arms. The defendant then recounted the events of the night before Tyrell was rushed to the emergency room. The defendant testified that she struck | nTyrell hard with both her open hand and closed fist and dropped him to the hard, unpadded floor in a manner that “was not gentle.”
While insinuating that someone else in the Menyweather house might have inflicted some of Tyrell’s injuries, the defendant nonetheless admitted that she never saw anyone else hit the baby. She specifically admitted that she never saw Jerome harm her children; to the contrary, she testified that he reprimanded her for striking them and for leaving the babies alone. As to the acute burn on Tyrell’s hand, when confronted with the medical evidence that it could not be a casual and unintentional injury, she was unable to explain its severity. She merely stated that other persons in the house had access to Tyrell; however, she admitted that she never made an effort to find out who had inflicted such a torturous wound on her baby.
The defendant further admitted that Jerome “meant the world” to her and that she had told Sergeant Humble that he was more important to her than God or her children. She also conceded her statement to the officer that she had wondered what it would be like to have only one child.

Discussion

Viewing the evidence in the light most favorable to the prosecution, we find that the state adequately proved that the defendant possessed the specific intent to kill.
The evidence demonstrates that the defendant — and the defendant alone — inflicted the severe and devastating injuries upon Tyrell. The night before the baby was hospitalized, she repeatedly struck him in the head, shook him, and dropped him on a cement floor. She then failed to seek medical attention for the gravely injured child until a visitor observed and commented upon his condition | igthe next afternoon.[3] The medical testimony firmly establishes the fatal and catastrophic nature of Tyrell’s injuries. The doctors testified that, to inflict such injuries, tremendous force had to be applied to the body of this small infant. The record demonstrates that the baby survived only as a result of heroic medical intervention and that his injuries have caused permanent and life-altering disabilities. Clearly, a reasonable trier of fact could infer the specific intent to kill from the infliction of such extreme and severe injuries to a totally defenseless nine-month-old baby.
Further supporting this conclusion are the defendant’s own admissions that her children were an impediment to her relationship with a man she revered more than God and her own children. The defendant was disgruntled by the fact that other persons would not relieve her of her parental responsibilities so that she could go out with her boyfriend and enjoy herself. She was irate because the boyfriend persistently went out at night without her. Her boyfriend did not want to be seen in public with her children. The babies proved to be annoying and disruptive, crying *585 constantly; their crying made the defendant angry. The boyfriend’s disenchantment had become so severe that he had decided to send the defendant and her children back to Nebraska. The defendant wondered what it would be like to not have the children or at least to have only one child; she was apparently nostalgic for the days before the victim’s birth when her family willingly cared for her older child while she left the house.
Based on the foregoing, we find that the defendant’s actions demonstrated more than an intent to substantially harm her child. The fatal nature of the baby’s head injury and the extensive nature of his other injuries, combined together with hsher own admissions, support a finding that the defendant possessed the intent to kill her infant.
This assignment of error is without merit.
EXCESSIVE SENTENCE
In two assignments of error, the defendant contends that the trial court erred in imposing an excessive sentence. Her specific complaints are that the trial court failed to adequately consider all mitigating factors and that it incorrectly concluded that she received leniency in this ease. As a result, the defendant urges that the 20-year sentence at hard labor imposed by the trial court was not individually tailored to the circumstances of her case.
Prior to sentencing, the trial court conducted a sentencing hearing at the state’s request. Testimony was presented by Lou Ann Prince, a specialist with the Department of Social Services who was monitoring Ty-rell’s ease. According to Ms. Prince, Tyrell was blind in his left eye and, despite surgical intervention, he had only minor peripheral vision in his right eye. He was paralyzed on his right side, and his right hand was fisted due to the paralysis. Although Tyrell was 27 months old at the time of sentencing, he was unable to walk. Ms. Prince also testified that the child was taking daily medication to control seizures, was undergoing physical therapy twice a week, and had been classified as having developmental delays.
Sergeant Humble also testified at the sentencing hearing. She stated that after Tyrell was admitted to the hospital with life-threatening injuries, the defendant’s older child Antonio was taken into custody by child protection services. A medical examination revealed that Antonio had sustained injuries rendering him deaf, blind, and slightly paralyzed on one side. Following Sergeant Humble’s testimony, the trial court admitted into evidence a bill of indictment | ^charging the defendant with cruelty to a juvenile as the result of her abuse of Antonio, as well as Antonio’s medical records.
At sentencing, the trial court reviewed the presentence investigation report, noting the defendant’s personal information and background. The trial court then discussed the facts of the offense of conviction, particularly the injuries she inflicted upon Tyrell. The trial judge also referred to factors which he believed resulted in the defendant receiving leniency in this case, such as the fact that the defendant was not charged with murder only as a result of the doctors’ valiant and successful efforts to save Tyrell’s life.
The trial judge concluded by noting that the defendant’s crime of conviction placed her in grid cell 2G for a designated sentence range of 36 to 60 months under the Louisiana Sentencing Guidelines. However, the trial judge found the guidelines to be “totally inappropriate” in this instance because of the severity of the defendant’s conduct. Recognizing that maximum sentences are reserved for the worst offenders, the court found that the defendant’s conduct warranted imposition of the maximum sentence, despite her lack of a prior criminal record.

Law

Under the law in effect at the time of the defendant’s sentencing,[4] the trial court was required to consider the sentencing guidelines. However, the court could disagree and choose not to follow the guidelines even in the absence of aggravating or mitigating circumstances. State v. Smith, 93-0402 (La. 7/5/94), 639 So.2d 237; State v. *586 Tumblin, 27,122 (La.App. 2d Cir. 6/21/95), 658 So.2d 222. While the court had to consider the guidelines, it had complete discretion to reject them and impose any sentence which was not constitutionally excessive, so long as | isthe sentence was-within the statutory range for the crime of conviction and the court stated for the record the considerations and factual basis for the imposition of that sentence. State v. Smith, supra; State v. Tumblin, supra.
Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence is constitutionally excessive if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Richardson, 545 So.2d 714 (La.App. 2d Cir.1989).
A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of discretion, we do not set aside a sentence as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Madison, 535 So.2d 1024 (La.App. 2d Cir.1988); State v. Thompson, 25,583 (La. App. 2d Cir. 1/19/94), 631 So.2d 555.
As a general rule, maximum sentences are appropriate only in cases involving the most serious violation of the offense and the worst type of offender. State v. DeWoody, 26,502 (La.App. 2d Cir. 11/3/94), 645 So.2d 290; State v. Madison, supra.

Discussion

After a careful examination of the record, we find no abuse of the trial court’s discretion in imposing sentence upon this defendant. The numerous, severe injuries the defendant inflicted upon the victim manifested deliberate cruelty and involved considerable violence. Tyrell was an innocent and completely helpless nine-month-old baby who was brutally abused by his ownj^mother. In fact, one of his attending physicians (who had interpreted C.T. scans of “tens of thousands” of infants) characterized this case as one of the worst instances of child abuse he had ever seen. The other attending physician testified that he was surprised the baby survived. Tyrell’s injuries have had tragic and lasting effects, as attested to by the evidence presented by his doctors at trial and his social worker at the sentencing hearing. Because of the defendant’s criminal conduct, this child has been permanently deprived of the ability to lead a normal life. These factors overwhelmingly support the sentence imposed, even in light of any relevant mitigating factors.[5]
In State v. Sepulvado, 26,948 (La.App. 2d Cir. 5/10/95), 655 So.2d 623, writ denied, 95-1437 (La. 11/13/95), 662 So.2d 465, this court affirmed a 21-year sentence, the statutory maximum at the time of conviction, for a defendant convicted of manslaughter. The defendant in that case had no prior criminal history. However, the trial court concluded that such a sentence was appropriate where that defendant failed to aid her six-year-old son as her husband beat, tortured, and scalded him in a manner leading to an especially cruel and heinous death. The trial court also noted other aggravating factors, similar to ones found in the instant case, including the defendant’s use of her status as the child’s mother to facilitate the commission of the offense; the manifestation of deliberate cruelty to the victim; and the young child’s vulnerability.
In light of the reasons cited by the trial judge, the evidence in the instant record, and this court’s prior decision in the Sepulvado case, the defendant’s sentence is not grossly out of proportion to the offense committed and does not 117shock one’s sense of justice. The sentence was tailored to both the offender and the offense. While the trial judge *587 referred to this offense as “a sad commentary on our society today" and made other similar irrelevant comments, the sentence was otherwise appropriate in this instance.
This assignment of error is without merit.
ERROR PATENT
The defendant’s final assignment requested a review of the record for errors patent. This request is unnecessary since such a review is made automatically in all criminal cases. La.C.CrJP. art. 920; State v. Stamper, 615 So.2d 1359 (La.App. 2d Cir.1993), modified on other grounds, 624 So.2d 1208 (La.1993). The record was reviewed for any errors patent, and none were found.
CONCLUSION
The defendant’s conviction and sentence are affirmed.
AFFIRMED

. Sergeant Humble explained that Detective Lin-son mistakenly recorded over the beginning portion of this taped statement.

. Tyrell's nose was initially injured on October 19, when he reportedly fell off a bed while in Jerome's care. (However, Jerome testified that the defendant was present when the child was injured.) The defendant took him to the emergency room for treatment of this injury. However, when the baby was seen by Dr. Bermudez a week later, on October 26, the nose had been reinjured and the wound reopened.

. The defendant’s assertion that she did not recognize the baby's need for medical attention after any of the beatings she inflicted upon him is belied by her intelligent demeanor on the witness stand.

. The Louisiana Sentencing Guidelines were repealed by Acts 1995, No. 942, which became effective August 15, 1995. The defendant was sentenced on May 10, 1995.

. The defendant argues that the trial court failed to considered her emotional health. However, no evidence of any mental incapacity was presented by the defense. To the contrary, the testimony of the defendant, who graduated from high school and attended one year of college, showed her to be bright and articulate.