785 So.2d 140 (2001)
STATE of Louisiana, Appellee,
v.
Basheen HUTCHERSON, Appellant.
No. 34,540-KA.
Court of Appeal of Louisiana, Second Circuit.
April 4, 2001.
*142 H. Cameron Murray, Counsel for Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Stephen Sylvester, Assistant District Attorney, Counsel for Appellee.
Before WILLIAMS, GASKINS & DREW, JJ.
DREW, J.
Basheen Hutcherson was tried by a jury on the charge of attempted second degree murder because of severe injuries he allegedly caused to his nearly five month old daughter on March 5, 1997. He was convicted on October 28, 1998 of the responsive verdict of Attempted Manslaughter, and on January 19, 1999, he was sentenced to 15 years at hard labor, with credit for time served. On May 22, 2000, the trial court denied defendant's motion to reconsider sentence. On appeal, Hutcherson argued the evidence was insufficient to convict and that the sentence was excessive. The conviction and sentence are affirmed.

FACTS
On October 8, 1996, Terri Ethridge gave birth to a daughter, Basheena Hutcherson. The father of the child is defendant, Basheen Hutcherson. The parents were never married, and at the time of the incident, the mother was living with her father in West Monroe, and defendant was living with his mother in Monroe.
Since Terri Ethridge was attending school at Career Training Specialists in Monroe and the defendant was unemployed, the two parents worked out an arrangement whereby Ms. Ethridge and the baby would be dropped off at defendant's home. After taking Ms. Etheridge to school, the defendant would return home with the baby. He would then keep the child at his home until Ms. Ethridge's school was out. He would then take the child with him to pick up the child's mother at school, and take her and the child to her Dad's home.
On the morning of March 5, 1997, Ms. Ethridge brought the child to defendant, and he took her to school and kept the child. All witnesses at trial agreed that when she delivered the child to defendant that morning, the child was in excellent health, with no serious injuries. The only possible injury that the child had at that time was a little mark on her arm, according to Ms. Ethridge.
When defendant picked up Ms. Ethridge from school that afternoon, the child was in the back seat in a child seat. The time was in dispute at trial. Detective Larry Linson of the child abuse division of the *143 Monroe Police Department, testified that in an oral statement made on the evening of March 5, 1997, and in a recorded statement made on March 6, 1997, defendant stated the time was 1:50 p.m. At trial, both defendant and Ms. Ethridge insisted the time was 1:15 p.m.
Defendant picked up Ms. Ethridge, then went to get gas for the car. On the way to the gas station, he told her that the baby had fallen off his bed. He stated he had the radio on to keep her awake, because he had heard that's what you were supposed to do. Alarmed, Ms. Ethridge pulled the child into her lap and realized that the child would not wake up. At that time, the parents were only a couple of blocks from St. Francis Hospital. Instead of going to that hospital, defendant drove across the river, to Ms. Ethridge's father's home in West Monroe, to get her medical card.
At her home, Ms. Ethridge briefly explained the situation to her father's fiancee', Tamara Jackson (Tamara Cox at trial). Ms. Jackson examined the baby and noticed she was completely limp and her right eye pupil was completely blown or dilated. She thought the child was dead or almost dead. Defendant insisted to her that the child was not dead. Ms. Jackson insisted that the parents immediately take the child to a hospital. She followed them to Glenwood Medical Center.
Ms. Jackson arrived at the hospital before defendant and watched his arrival. He did not go to the emergency room entrance. Instead he drove around, looking for a parking spot. As Ms. Jackson watched, he parked across the street from the hospital, then walked with the child to the emergency room. When the nurse at the emergency room window saw the condition of the child, she literally snatched the child from Ms. Ethridge's arms and pulled the child through the reception window, and rushed to find a doctor.
In perhaps what will be the luckiest event in this child's life, Dr. Bermudez, a noted pediatric neurosurgeon, was present in the emergency room as she was brought in. He examined the child and quickly realized that the child had suffered serious trauma to the head and brain, that her brain was swelling from bleeding and that the child was in immediate need of brain surgery to relieve the pressure. At his initial examination, he felt the prognosis for the child's survival was poor.
As Dr. Bermudez examined the baby, he noticed that she had numerous bruises on her head and face. Both eyes were bruised and she had multiple "lateral" bruises on her head and face, indicating to him that she had been struck with an object. Her right eye was not responsive and she exhibited classic signs of "shaken baby syndrome." As Dr. Bermudez prepared the child for surgery, he photographed the injuries to her face and head, including both eyes and both ears.
The problem he described was that the trauma from the shaking and hitting of the baby's head with, or against an object had ruptured arteries in her brain, causing the brain to swell. Because the skull is like a closed box, once a brain begins to swell, the increased pressure inside the skull prevents the heart from delivering needed oxygen to the brain. As a result, the brain starts dying. It was clear to Dr. Bermudez that the child's brain stem had begun to die by the time he examined her.
Within minutes of arriving at the emergency room, Dr. Bermudez was cutting into the child's skull to remove blood, relieving the pressure on the brain. As he examined the child's skull, the lining of her brain and her brain itself, he noted a half inch of blood surrounding her brain, which he removed. He also made medical findings that at the area of the surgery, the *144 child had suffered multiple blows to the head, including at least one very serious one. This evidence of multiple blows was pointed out to the jury by Dr. Bermudez.
The physicians at trial likened the extent of the injury to someone on a motorcycle, without a helmet, hitting a brick wall. They also stated that if a football player had received the same injury, he would have been immediately unconscious. The doctors suspected child abuse and contacted the authorities.
Detective Linson was dispatched to the Glenwood Hospital to investigate. He questioned Ms. Ethridge, who told him she had dropped the child off with defendant that morning and the child was fine, with no bruises, and when Mr. Hutcherson picked her up from school, she could not get the child to wake up. She then described to him how they had gotten gasoline and drove to West Monroe to get her medical card.
The detective next questioned defendant. He Mirandized him, and defendant told him that Ms. Ethridge arrived at his home at around 7:35 a.m., that he took her to school around 8:00 a.m. and that he was alone with the baby throughout the day. Defendant further stated that between 1:00 p.m. and 1:15 p.m., he pulled the baby to the edge of his bed and changed her soiled diaper. He then stated that he left the baby at the edge of his bed, and went outside to throw the soiled diaper into the city garbage can. When he returned, the child was on the floor crying. He then picked the baby up, put her in the car seat, and went to pick up the mother.
After obtaining consent to search defendant's home, Detective Linson examined defendant's room and found the bed to be 22 inches off the floor, and the floor to be tile-covered concrete. He found two diapers in a trash can in the house, one soiled and one wet. Next, the detectives searched the outside garbage can and did not find the soiled diaper defendant described throwing into that can.
The child survived the surgery, although Dr. Bermudez left part of her skull detached for several days in case of further swelling. As Dr. Bermudez took post-op photographs the next day after the surgery, he noticed and photographed still more bruises appearing on the child's face and head. He stated these bruises were not from the surgery, and that it was not abnormal for some bruises to appear a day after the trauma causing them.
The child was discharged from the hospital on March 25, 1997, showing some left hemiparesis, and a left ataxia. Although by the time of trial the child was appearing normal and the paralysis on her left side had disappeared, all of her doctors felt that it was possible that in school and later in life she would exhibit problems resulting from the trauma to her brain. Defendant was arrested and charged with Attempted Second Degree Murder.
At trial, Dr. Bermudez, Dr. Meade, and Dr. Bodron all testified that the medical evidence showed heavy shaking, and multiple blows, of substantial force, to the child, including trauma to both ears, both eyes, and both sides of the head, and that much of the trauma was caused by a linearshaped object. All of the treating physicians agreed that the child's injuries could not have been caused by a fall from a bed.
Tamara Cox testified about seeing the child at her home and realizing it was in serious condition, and about the odd behavior of defendant in taking the child to the hospital.
Kerisha Hutcherson, defendant's sister, identified the soiled diaper found by Detective Linson in the inside trash can as one she had taken off of her own child the day before the incident.
*145 Terri Etheridge testified that she was still with defendant and was expecting another child with him. She further testified that, except for a small mark on her arm, the child was in excellent health when she was dropped off with defendant.
The defendant testified that he did not harm the child, and the only injury the child received was the fall from the bed. He agreed his child was in excellent health when she was dropped off on March 5, 1997. He disagreed with the doctors' statements about multiple bruises caused by multiple blows, saying they were lies. He disagreed with the police officers' assertions that he told them in statements that the fall had occurred at 1:15 and he waited until 1:50 to pick up Ms. Ethridge. He stated the police officers also had lied.
The jury found defendant guilty of the responsive verdict of attempted manslaughter. During the sentencing of defendant on January 19, 1999, the trial court reviewed every factor in La.C.Cr.P. art. 894.1, and then sentenced defendant to 15 years at hard labor, with credit for time served. The trial court noted the offense was a crime of violence.

LAW
La. R.S. 14:31 defines manslaughter as follows:
31. Manslaughter
A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.
B. Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years. However, if the victim was killed as a result of receiving a battery and was under the age of ten years, the offender shall be imprisoned at hard labor, without benefit of probation or suspension of sentence, for not less than ten years nor more than forty years.
Attempt is defined in La. R.S. 14:27 as follows:
27. Attempt
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the *146 intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
C. An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.
D. Whoever attempts to commit any crime shall be punished as follows:
(1) If the offense so attempted is punishable by death or life imprisonment, he shall be imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence;
(2) If the offense so attempted is theft or receiving stolen things, and is not punishable as a felony, he shall be fined not more than two hundred dollars, or imprisoned for not more than six months, or both. If the offense so attempted is receiving stolen things, and is punishable as a felony, he shall be fined not more than two hundred dollars, or imprisoned not more than one year, or both. If the offense so attempted is theft, and is punishable as a felony, he shall be fined not more than five hundred dollars, or imprisoned not more than one year, or both;
(3) In all other cases he shall be fined or imprisoned or both, in the same manner as for the offense attempted; such fine or imprisonment shall not exceed one-half of the largest fine, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both.

DISCUSSION
Defendant argued that the evidence presented by the state was constitutionally insufficient to support a conviction for attempted manslaughter. The defendant argued the state did not offer enough evidence that the defendant had the specific intent to kill his daughter. The only evidence of intent was the doctors' statements that the injuries were inconsistent with his statement that the child fell off a bed along with the allegations that he delayed seeking medical attention for his baby. Defendant asserted that this does not rise to the required threshold level of constitutional due process.
This court has addressed an almost identical set of facts and procedural history in the case of State v. Sellen, 28,191 (La.App.2d Cir.6/26/96), 677 So.2d 578. The same Dr. Bermudez treated a baby with similar "very massive" head injuries. Sellen asserted the injury occurred while the baby's diaper was being changed. In Sellen, supra, the defendant mother was charged with attempted second degree murder and the jury found her guilty of the responsive verdict of attempted manslaughter. This court, in the Sellen opinion stated:
The defendant was charged with attempted second degree murder. The jury returned a compromise responsive verdict of attempted manslaughter, as allowed under La.C.Cr.P. Art. 814. If the evidence adduced at trial was sufficient to support a conviction of the charged offense, the jury's verdict is authorized.
A specific intent to kill is an essential element of the crime of attempted second degree murder, and also of the responsive crime of attempted manslaughter. A conviction for an attempted offense must rest upon sufficient proof that the offender actively desired to cause the proscribed criminal consequences to follow his act or failure to act and that the offender committed or *147 omitted an act for the purpose and tending directly toward the accomplishing of his object.
Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant.
The determination of whether the requisite intent is present in a criminal case is for the trier of fact. In reviewing the correctness of such a determination, an appellate court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. Art. 5, § 5(C) A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part.
677 So.2d at 581-2. (Citations omitted.)
Defendant argued to the jury and to this court that the evidence does not support a finding that he had an intent to kill his child. The law is clear that although specific intent to kill is not necessary for a conviction of manslaughter, a specific intent to kill is required for a conviction of attempted manslaughter.
Viewing the evidence in the light most favorable to the prosecution, this court finds that the state adequately proved that the defendant possessed the specific intent to kill. The medical evidence is very clear and uncontroverted that the five-month-old victim was seriously and repeatedly injured by someone using a linear object. The baby could not have harmed itself. The evidence showed that the injuries were caused by very tremendous force to the baby's head, and without medical intervention, the child would have quickly died. The only person present during the time the child was repeatedly injured with that tremendous force was the defendant. The evidence demonstrates that the defendantand the defendant aloneinflicted the severe and devastating injuries upon his child.
The record also shows that the baby arrived at the hospital all but dead, and survived only as a result of heroic medical intervention. Clearly, a reasonable trier of fact could infer the specific intent to kill from the intentional infliction of such extreme and severe injuries to a totally defenseless five-month-old baby.
This defendant's actions demonstrated more than an intent to substantially harm his child. The near fatal nature of the baby's head injury, and the clear evidence of repeated blows to the head, establish the defendant intended to kill his daughter.
Defendant argued that the evidence supports reasonable hypotheses other than a specific intent to kill. First, the defendant could have intended to punish or discipline the crying child to teach her not to cry. The second scenario set forth by the defendant was defendant could have been angry at the child for crying and intended to inflict bodily harm upon her. Defendant argued the intent to inflict bodily harm is not the same as the intent to kill.
In assessing other possible hypotheses in circumstantial evidence cases, the appellate court does not determine whether another possible hypothesis suggested *148 by a defendant could afford an exculpatory explanation of the events. Instead, this court evaluates the evidence in the light most favorable to the prosecution and determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).
The defendant's evidence did not support the hypothesis asserted before this court. The defendant testified at trial, and insisted that the injuries occurred only as a result of the baby falling off the bed. He specifically denied ever hitting or shaking the baby, claiming the doctors and police officers who testified otherwise, were liars. The defendant, while testifying, did not present the jurors with any evidence of an attempt by him just to punish the baby or just to seriously harm the baby. The jury rejected his only explanation.
The Jackson standard also does not provide a defendant with a means of presenting alternative and inconsistent defenses in different forums, raising one defense before a jury and when that fails, a second defense offering a different set of facts in an appellate court which reviews evidentiary sufficiency under Jackson and La.C.Cr.P. art 821(E). State v. Juluke, 98-0341, (La.1/8/99), 725 So.2d 1291.
When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises reasonable doubt. State v. Captville, 448 So.2d 676, (La.1984). A jury's decision to credit the State's witnesses and not the defendant's testimony is within their discretion. State v. Minnifield, 31,527 (La.App.2d Cir.1/20/99), 727 So.2d 1207, writ denied, 99-0516 (La.6/18/99), 745 So.2d 19. This assignment of error is without merit.
Next, the defendant asserted that the trial court erred in imposing an excessive sentence. Specifically, defendant maintained the trial court took very little cognizance of the statements of the victim's mother and friends and neighbors and repeatedly voiced his disagreement with the jury's responsive verdict of guilty of attempted manslaughter. In defendant's view, probation would have been more appropriate.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App.2d Cir.6/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864.
*149 There is no requirement that specific matters be given any particular weight at sentencing. State v. Jones, 33,111 (La.App.2d Cir.3/1/00), 754 So.2d 392, writ denied, XXXX-XXXX (La.2/2/01), 783 So.2d 385. A review of the record indicated the trial court was aware of the matters urged by the defense prior to imposing sentence.
The trial court reviewed defendant's presentence investigation report, noting, in detail, the defendant's personal information and background. The trial court then discussed, in detail, the facts of the offense of conviction, particularly the injuries defendant inflicted upon his daughter. The trial judge also referred to factors which he believed resulted in the defendant receiving leniency in this case, such as the fact that the defendant was not charged with murder only as a result of the doctor's valiant and successful efforts to save his daughter's life.
Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864.
A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, we will not set aside a sentence as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Washington, 29,478 (La.App.2d Cir.4/2/97), 691 So.2d 345.
As a general rule, maximum sentences are appropriate only in cases involving the most serious violation of the offense and the worst type of offender. State v. DeWoody, 26,502 (La.App.2d Cir.11/3/94), 645 So.2d 290. Defendant received ¾ of the maximum twenty-year sentence.
Our careful examination of the record shows no abuse of the trial court's discretion in imposing a 15-year sentence upon this defendant. The medical evidence was very clear that numerous, severe injuries were inflicted upon the five-month-old victim by defendant who used deliberate cruelty and considerable violence on an innocent and completely helpless baby. All of the attending physicians for this baby describe a series of blows and shakes that alone would have killed or seriously harmed the victim. Further, there was one massive blow that immediately rendered the infant unconscious, and dying. While two years later the child has somewhat recovered she may well suffer problems in the future, according to the medical experts. She is alive only because of the heroic efforts of her doctors. These factors overwhelmingly support the sentence imposed, even in light of any relevant mitigating factors.
The record shows that the trial court carefully detailed virtually every factor in La.C.Cr.P. art. 894.1 and addressed all mitigating evidence and arguments by the defendant.
In light of the reasons cited by the trial judge here, the defendant's sentence is not grossly out of proportion to the offense committed and does not shock one's sense of justice. The sentence was tailored to both the offender and the offense. While the trial judge clearly disagreed *150 with the jury's verdict, and stated at sentencing that defendant could have been convicted on the evidence of attempted second degree murder, it is clear the sentencing court did not substitute its factual findings for that of the jury, and the sentence here, five years less than the maximum possible, was appropriate for attempted manslaughter in this instance.
It is suggested that this assignment of error is without merit.

ERROR PATENT
Although defendant did not request a review of the record for errors patent, such a review is made automatically in all criminal cases. La.C.Cr.P. art. 920; State v. Stamper, 615 So.2d 1359 (La.App. 2d Cir.1993), modified on other grounds, 624 So.2d 1208 (La.1993). None were found.

CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.