**STATE OF LOUISIANA**                 *        NO. 2024-KA-0061

**VERSUS**                             *
                                                **COURT OF APPEAL**
**APRIL BUTLER**                       *
                                                **FOURTH CIRCUIT**
                                       *
                                                **STATE OF LOUISIANA**

                            * * * * * * *


APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 553-883, SECTION "E"
Judge Rhonda Goode-Douglas
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Judge Roland L. Belsome, Judge Daniel L. Dysart, Judge Dale N. Atkins)

Jason R. Williams, District Attorney
Brad Scott, Chief of Appeals
Zachary M. Phillips, Assistant District Attorney
ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE
619 South White Street
New Orleans, LA 70119

　　　　　COUNSEL FOR APPELLEE, the State of Louisiana


Mary Constance Hanes
LOUISIANA APPELLATE PROJECT
P. O. Box 4015
New Orleans, LA 70178


　　　　　COUNSEL FOR APPELLANT, April Butler

　　　　　　　　　　　　　　　　　　　　　　　　　**AFFIRMED**
　　　　　　　　　　　　　　　　　　　　　　**DECEMBER 30, 2024**

DNA

RLB

DLD

This criminal appeal concerns a shooting incident. Appellant, April Butler ("Ms. Butler"), seeks review of her conviction for attempted manslaughter. Appellee is the State of Louisiana ("State"). For the following reasons, we affirm Ms. Butler's conviction.

## FACTUAL AND PROCEDURAL HISTORY

### Bill of Information

On April 7, 2022, in the Criminal District Court for the Parish of Orleans, the State filed a Bill of Information which charged Ms. Butler with one count of attempted second degree murder of Daysha Richard ("Ms. Richard") in violation of La. R.S. 14:27[1] and La. R.S. 14:30.1[2] ("Count One"). The Bill of Information also charged Ms. Butler with one count of aggravated assault with a firearm committed against a juvenile, C.L., in violation of La. R.S. 14:37.4 ("Count Two").[3] On May 2, 2022, Ms. Butler appeared for arraignment where she pled not

---

[1] Louisiana Revised Statutes 14:27(A) states that "[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended" and that it is "immaterial whether, under the circumstances, he would have actually accomplished his purpose."

[2] Louisiana Revised Statutes 14:30.1 outlines the crime of second degree murder and the punishment for same.

1

guilty to the charges. Ultimately, the matter proceeded to a jury trial, which ran from August 7, 2023, through August 9, 2023.

**<u>Summary of Trial Testimony</u>**

At trial, in pertinent part, the State presented the testimony of Erika Darby ("Ms. Darby"), Officer Nademah Zeitoun ("Officer Zeitoun"), Detective James Roberson ("Detective Roberson"), and Ms. Richard. Ms. Butler presented the testimony of Tiffany Watson ("Ms. Watson") in her defense. Each witness' testimony is summarized in turn.

### *Ms. Darby's Testimony*

Ms. Darby testified for the State and identified herself as an employee of the public records department for the Orleans Parish Communication District ("OPCD"), explaining that her job entailed "sending out the 911 audio and the incident recall and dispatch recording . . . to the [District Attorney]'s office[,] different police officers and the public by request." Ms. Darby explained that when someone telephones 911, the OPCD generates an item number in its computer system under which the audio recording of the phone call and an incident recall are stored. She described the incident recall as a transcript of the 911 phone call.

During Ms. Darby's testimony, the State introduced into evidence the 911 audio recordings regarding a February 12, 2022 shooting at the AutoZone located

---

[3] The State brought Count Two because Ms. Richard's son, C.L., was present at the shooting. Louisiana Revised Statutes 14:37.4 provides:

> A. Aggravated assault with a firearm is an assault committed with a firearm.

> B. For the purposes of this Section, "firearm" is defined as an instrument used in the propulsion of shot, shell, or bullets by the action of gunpowder exploded within it.

> C. Whoever commits an aggravated assault with a firearm shall be fined not more than ten thousand dollars or imprisoned for not more than ten years, with or without hard labor, or both.

at 1531 Elysian Fields Avenue and played them for the jury. In pertinent part, during the recording, one of the callers, Mija Laneheart ("Ms. Laneheart"), described the shooter as a "black female" who was "wearing a white shirt" and identified the shooter by the name "April." Though Ms. Laneheart did not provide the shooter's last name during her call, as Ms. Darby stated, the 911 operator did not ask Ms. Laneheart if she knew the shooter's last name. None of the other 911 callers provided information about the shooter. During Ms. Darby's testimony, the State also introduced into evidence a document that Ms. Darby identified as the incident recall generated from the February 12, 2022 phone calls placed to 911 regarding the shooting incident at the AutoZone. Therein, the full name "April M. Butler" appears. In explaining why the full name "April M. Butler" appeared in the incident recall even though none of the 911 callers identified the shooter by her full name, Ms. Darby testified that this information was generated when the 911 dispatcher ran the information and license plate provided regarding the shooter's vehicle.

### Officer Zeitoun's Testimony

Officer Zeitoun testified that in her capacity as a New Orleans Police Department ("NOPD") officer, she responded to a call on February 12, 2022, regarding an aggravated battery by shooting. As Officer Zeitoun explained, she tended to the shooting victim and obtained preliminary information from the victim and witnesses after meeting them at the intersection of North Claiborne and Elysian Fields but, "[t]o [her] knowledge," the victim had come from the AutoZone on Elysian Fields. During Officer Zeitoun's testimony, the State introduced her body-worn camera footage into evidence and played it for the jury. Therein, Ms. Laneheart stated that the shooter had some kind of mask on her face

and that the shooter and Ms. Richard had been engaging in back and forth phone calls with each other that day. To this end, Officer Zeitoun summarized that the situation arose because "both [the shooter and the victim were] arranging to get into a physical altercation over a man" with whom "they were both involved." Officer Zeitoun answered affirmatively when asked if Ms. Laneheart had been with Ms. Richard at the time of the shooting and was, therefore, a witness to the shooting.

### *Detective Roberson's Testimony*

Detective Roberson identified himself as a detective with the Fifth District of the NOPD, in which capacity he responded to an aggravated battery by shooting at 1531 Elysian Fields Avenue on February 12, 2022. He identified the victim of the shooting as Ms. Richard. Counsel for the State then asked Detective Roberson how his investigations proceed when he arrives at the scene of a shooting, whereupon he answered, "Normally when I come up on any shot person, especially in the fifth district, I tend to ask only one thing. And [it has] been a habit of mine. [It is]: Do you know who shot you? And the victim in this case did say April Butler shot me." Detective Roberson clarified that Ms. Richard provided him with this identification "directly after the shooting." Detective Roberson testified that Ms. Richard further identified Ms. Butler as the "current girlfriend" of her son's father and explained that she and Ms. Butler "had gotten into an altercation [when] they . . . passed each other while driving and then relocated into the AutoZone parking lot where she was shot." When asked whether "based on [his] investigation," it was "pretty apparent that the victim and the perpetrator knew each other," Detective Roberson answered affirmatively and also testified that Ms. Richard told him that she and Ms. Butler had been talking back and forth over the phone on the day of

the shooting. He also clarified that Ms. Richard did not provide a physical description of her shooter, just a name. However, Detective Roberson testified that a physical description is unnecessary when the situation involves a known perpetrator.

When asked whether he relied solely on Ms. Richard's identification of Ms. Butler, Detective Roberson responded, "[n]ot solely," but explained that he places "a heavy weight" on victim statements. Detective Roberson further testified that he "had no feeling that [Ms. Richard] was not being credible." He specified that Ms. Richard never wavered in her identification; never expressed any hesitation in her identification; and never provided him with any reason to disbelieve her. Additionally, Detective Roberson stated that he never received any evidence to the contrary, i.e., any evidence demonstrating that Ms. Butler was not the one who shot Ms. Richard.

In discussing additional information he gathered that corroborated Ms. Richard's identification, Detective Roberson also testified that at the scene of the shooting someone showed to him a "picture of a license plate [on the shooter's vehicle] that" investigators ultimately determined belonged to a vehicle that "was registered to" Ms. Butler. Additionally, Detective Roberson testified that at the scene of the shooting, "[a]n anonymous passerby" provided him with a video taken "[f]rom the side of [a] Shell gas station facing [the] AutoZone parking lot," which depicted the shooting. Detective Roberson clarified though that the video was "blurry" and that he could not specifically identify Ms. Butler in it. Detective Roberson testified that as the lead investigator, he ultimately obtained an arrest warrant for Ms. Butler after collecting the abovementioned video evidence and speaking with Ms. Richard and the witnesses to the shooting.

### Ms. Richard's Testimony

Ms. Richard testified that she was at the AutoZone on Elysian Fields Avenue on February 12, 2022. Counsel for the State asked her why she went to the AutoZone that day, whereupon she explained, "Because me and Ms. April [sic] were passing words, and we both said to meet up at AutoZone. She agreed. After she continued to call, I agreed. [That is] what happened." Ms. Richard estimated that she and Ms. Butler had been on ten to fifteen calls on which they were "passing words" that day. When further asked if she "and Ms. Butler had any beef or ill will in the past," Ms. Richard responded, "Yeah. This [was] an ongoing situation."

Counsel for the State then asked Ms. Richard to describe what happened when she arrived at the AutoZone that day, and the following colloquy occurred:

> A     When we got to AutoZone, Ms. Butler continued to call, and I did answer my phone, and we were going back and forth verbally. She agreed to meet me at the AutoZone. When she pulled into the AutoZone from the Shell gas station, she pulled in AutoZone off of the Claiborne side, like actually straight out of the Shell gas station, and the guy that was driving her car[4] pulled and turned around so they can pull straight out into traffic.
>
> . . . .
>
> [Q]   How was she attired that day?
>
> A     Oh, she had on a white shirt. She had on some jeans. She had something tied around her head, but I know it was her because she — we were passing words. I [did not] walk up to her, but we were passing words because she was on the opposite side.
>
> [Q]   And at this point, do you know who it is you are passing words with?
>
> [A]   Yeah. April Butler.

---

[4] Ms. Richard testified that she did not know the gentleman driving the car in which Ms. Butler arrived but confirmed that it was not her son's father.

Q      All right. So what happens, you know, as the words are getting passed?

      . . . .

[A]   Ms. Butler never came off of the passenger's side [of the vehicle in which she arrived]. Before you know it, Ms. Butler stood on the — her door was open. She stood up, and she shot over the vehicle. Yeah, she shot me, yes.

Q      And where were you at the time that she shot at you?

A      On the driver's side of the vehicle [in which I arrived.]

Ms. Richard later clarified that she could not definitively recall if Ms. Butler stood on the vehicle before firing the shots but stated that Ms. Butler definitely remained on the passenger side of her vehicle throughout the course of the incident. Ms. Richard testified that "[t]here were numerous . . . shots" and that Ms. Butler had come to the AutoZone that day having "agreed to come to fight [her]." She explained that one bullet hit her right hip and another struck the middle of her stomach. Additionally, Ms. Richard stated that after the shooting, she called Ms. Watson to take care of her son, who was present during the shooting.

Consistent with Detective Roberson's testimony, Ms. Richard stated that she provided Detective Roberson with Ms. Butler's name immediately after the shooting when he asked her if she knew who shot her. Referencing this identification, counsel for the State asked Ms. Richard if she had "physically laid eyes on Ms. Butler before" the shooting, to which she responded, "Yes. Numerous . . . times." Ms. Butler stated that although she ultimately "bla[c]ked out . . . [when] EMS" arrived, she remembered what happened before that. Thereafter, the State introduced into evidence the video taken from the vantage point of the Shell gas station and played it for the jury. While the video played, Ms. Richard pointed out herself, Ms. Butler, Ms. Laneheart, and the gentleman with Ms. Butler, as well

as her own vehicle and the vehicle in which Ms. Butler arrived. As the video continued to play but prior to shots being fired, Ms. Richard explained that she and Ms. Butler were yelling at each other from their respective positions during that time. Discussing the extent and severity of her injuries, Ms. Richard testified she had to stay at the hospital for approximately one-week and underwent about two months of physical therapy to learn how to walk again. Ms. Richard then identified Ms. Butler in the courtroom as the person who shot her.

### Ms. Watson's Testimony

Ms. Watson testified that on February 12, 2022, she went to the intersection of Elysian Fields and North Claiborne after the subject shooting occurred because Ms. Richard called her and asked her to come. According to Ms. Watson, during this phone call, Ms. Richard told her that she had been shot by "April." Further, Ms. Watson testified that she told one of the officers at the scene that the shooter "had on a mask, something covering half of her — covering her face" but that in so reporting she was merely repeating what Ms. Laneheart had said because she was not present when the shooting occurred.

At the close of trial on August 9, 2023, the jury found Ms. Butler guilty of the lesser offense of attempted manslaughter on Count One and not guilty on Count Two. Ms. Butler's timely appeal followed.

8

**ASSIGNMENT OF ERROR**

In her sole assignment of error, Ms. Butler asserts that "[t]here is insufficient evidence to support [her] conviction for attempted manslaughter" and that "the State failed to negate any reasonable probability of misidentification."

**ERRORS PATENT REVIEW**

In accordance with La. C.Cr.P. art. 920, we review all appeals for errors patent. An error patent is one "that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." La. C.Cr.P. art. 920(2). We have reviewed the pleadings and proceedings in this record, and there are no errors patent. Next, we begin our discussion with the standard of review applicable to Ms. Butler's assignment of error.

**DISCUSSION**

**Sufficiency of the Evidence — Standard of Review**

As this Court has previously explained, an appellate court's standard of review when analyzing a sufficiency of the evidence claim is to "determin[e] whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that all of the elements of the offense had been proven beyond a reasonable doubt." *State v. Groves*, 2020-0450, p. 21 (La. App. 4 Cir. 6/10/21), 323 So.3d 957, 971 (first citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); and then citing *State v. Tate*, 2001-1658, p. 4 (La. 5/20/03), 851 So.2d 921, 928). As this Court has further explained, the focus in this *Jackson* standard of review is on the rationality of the fact finder, such that the appellate court should overturn irrational decisions to convict; uphold rational decisions to convict; and impinge on the fact finder's discretion only if and when "necessary to guarantee the fundamental protection of

due process of law." *State v. Hunter*, 2022-0742, p. 5 (La. App. 4 Cir. 7/6/23), 371 So.3d 108, 113 (citations omitted). Thus, under this standard of review, an appellate court cannot "substitute its own appreciation of the evidence for that of the fact finder." *State v. Galloway*, 55,591, p. 9 (La. App. 2 Cir. 4/10/24), 384 So.3d 1167, 1174 (first citing *State v. Pigford*, 2005-0477, p. 6 (La. 2/22/06), 922 So.2d 517, 521; and then citing *State v. Steines*, 51,698, p. 7 (La. App. 2 Cir. 11/15/17), 245 So.3d 224, 229). Stated differently, "[u]nder the *Jackson* standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court." *State v. Williams*, 2011-0414 p. 18 (La. App. 4 Cir. 2/29/12), 85 So.3d 759, 771 (quoting *State v. Jones*, 2011-0649, p. 3 (La. App. 4 Cir. 10/19/11), 76 So.3d 608, 611). With these precepts in mind, we review the record to ascertain whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found that the State proved beyond a reasonable doubt all of the elements of attempted manslaughter in its case against Ms. Butler.

## Whether there Was Sufficient Evidence to Uphold Ms. Butler's Conviction for Attempted Manslaughter

As previously stated, the jury found Ms. Butler guilty of attempted manslaughter, and Ms. Butler argues that there was insufficient evidence to support this conviction, particularly because the State failed to prove the possibility of misidentification. To this end, Ms. Butler asserts that although "[Ms.] Richard testified that [Ms.] Butler was the person who shot her, there were no other witnesses who could identify [Ms. Butler] or corroborate any part of Ms. Richard's story," and the State presented no evidence to support Ms. Richard's testimony. Further, Ms. Butler contends that Ms. Richard's testimony was "internally

contradictory" because "she changed her story in an important respect after she viewed the video footage of the incident insofar as where the shooter was standing and the sequence of events leading to the shooting." Ms. Butler also notes conflicting testimony as to whether the shooter wore a mask and contends that this "calls into question Ms. Richard's identification of April Butler and her entire story."

***Elements of the Crime of Attempted Manslaughter***

Louisiana Revised Statutes 14:31(A)(1) defines manslaughter as "[a] homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." An attempt occurs when someone "who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object." La. R.S. 14:27(A). As La. R.S. 14:27(A) further states, "it shall be immaterial whether, under the circumstances, he [or she] would have actually accomplished his [or her] purpose." As the Louisiana Second Circuit Court of Appeal has explained, "[a] specific intent to kill is an essential element of the crime of attempted second degree murder, and also of the responsive crime of attempted manslaughter." *State v. Sellen*, 28,191, p. 5 (La. App. 2 Cir. 6/26/96), 677 So.2d 578, 581 (first citing *State v. Dean*, 528 So.2d 679, 682 (La. App. 2d Cir. 1988); and then citing *State v. Turner*, 440 So.2d 834, 836 (La. App. 2d Cir. 1983)). Louisiana Revised Statutes 14:10(1) defines specific criminal intent as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his [or her] act or failure to act."

11

Thus, "[t]o support a conviction for attempted manslaughter, the [S]tate must prove that the defendant specifically intended to kill the victim and committed an overt act in furtherance of that goal." *State v. Jackson*, 54,118, p. 5 (La. App. 2 Cir. 11/17/21), 334 So.3d 874, 878-79 (citing *State v. Glover*, 47,311, p. 5 (La. App. 2 Cir. 10/10/12), 106 So.3d 129, 135). As this Court has explained, specific intent can "be 'inferred from the defendant's actions and the circumstances of the transaction.'" *State v. Canales*, 2014-0663, p. 11 (La. App. 4 Cir. 12/10/14), 156 So.3d 1183, 1190 (first citing *State v. Brown*, 2003-0897, p. 22 (La. 4/12/05), 907 So.2d 1, 18; and then citing *State v. Barnes*, 2011-1421, p. 11 (La. App. 4 Cir. 9/19/12), 100 So.3d 926, 934). It can further "be inferred from the extent and severity of the victim's injuries, and the defendant's use of a deadly weapon to produce those injuries, which involved serious risk of death." *Jackson*, 54,118, p. 5, 334 So.3d at 879 (citing *State v. Washington*, 50,424, p. 6 (La. App. 2 Cir. 3/16/16), 188 So.3d 350, 356). In this regard, the Louisiana Supreme Court has held that specific intent to kill can be inferred if the defendant pointed a gun and fired it at the victim. *Id.* (citing *State v. Seals*, 1995-0305, p. 6 (La. 11/25/96), 684 So. 2d 368, 373). The trier of fact determines whether the requisite intent was present. *Id.* at p. 6, 334 So.3d at 879 (citing *State v. Lewis*, 46,513, p. 6 (La. App. 2 Cir. 9/28/11), 74 So.3d 254, 257).

In its case against Ms. Butler, the State not only had to prove the above elements but also "had to prove the identity of the defendant as the perpetrator." *State v. Weary*, 2003-3067, p. 18 (La. 4/24/06), 931 So.2d 297, 311. In discussing the issue of identification, the Louisiana Supreme Court has held that "when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the [S]tate is required to negate any reasonable probability

12

of misidentification." *Id.* (first citing *State v. Neal*, 2000-0674, p. 11 (La. 6/29/01), 796 So.2d 649, 658; and then citing *State v. Smith*, 430 So.2d 31, 45 (La. 1983)). However, the Louisiana Supreme Court has further held that "[a] positive identification by only one witness is sufficient to support a conviction." *Id.* (first citing *Neal*, 2000-0674, p. 11, 796 So.2d at 658; and then citing *State v. Mussall*, 523 So.2d 1305, 1311 (La. 1988)). That is, if the trier of fact made a credibility determination and believed the testimony of a single witness, then that witness' testimony alone is sufficient for the district court to convict and for the appellate court to affirm the conviction. *State v. Wells*, 2010-1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 306 (citing *State v. White*, 28,095, p. 14 (La. App. 2 Cir.5/8/96), 674 So.2d 1018, 1027).

For example, in *State v. Wolfe*, the defendant argued that there was insufficient evidence to support his conviction, particularly his identity as the perpetrator, because "the [S]tate's only evidence consisted of a single witness, Thomas, who viewed the incident from a second story window a block away and never got closer than ¾ of a block to the perpetrator" and because "there was no corroborating evidence." 1998-0345, p. 8 (La. App. 4 Cir. 4/21/99), 738 So.2d 1093, 1098. Moreover, "[t]he two other men, Ricky Campbell and Ricky Landry, who were with the victim at the time of the incident affirmatively testified that the defendant was not the perpetrator" and "provided descriptions of the perpetrator which were inconsistent with the defendant." *Id.* Nonetheless, on appeal, this Court found no abuse of the district court judge's discretion, noting that the "judge listened to the testimony of Thomas, Campbell and Landry and chose to accept Thomas'." *Id.* at p. 9, 738 So.2d at 1098. As this Court summarized:

> Thomas testified that he knew the defendant from the neighborhood. He stated that the street light[] illuminated the area well and he watched the defendant for a few minutes before the actual shooting. He saw the defendant abandon his bike and approach the victim on foot with a gun in hand. He further testified that he saw the defendant fire at the victim, who was on a bike, and when the victim fell, the defendant approached him and fired two more shots. Thomas gave chase, but could not catch the defendant. The [district court] judge chose this testimony to be the most credible.

*Id.*

In the matter *sub judice*, the jury found the testimony of a single witness, Ms. Richard, to be credible in terms of identifying Ms. Butler as her shooter. We find that any rational trier of fact could have found that the State proved beyond a reasonable doubt that Ms. Butler was the shooter, as in *Wolfe*, with the testimony of a single witness. Like in *Wolfe*, Ms. Richard and Ms. Butler knew each other: when asked whether she had ever physically laid eyes on Ms. Butler prior to the shooting, Ms. Richard answered, "Yes. Numerous . . . times." The record reveals that at the time of the shooting, Ms. Butler was the girlfriend of Ms. Richard's son's father. According to Ms. Richard's testimony, and as confirmed by Officer Zeitoun's preliminary information-gathering and Detective Roberson's investigation, Ms. Richard and Ms. Butler had been engaged in an ongoing dispute of sorts and had been "passing words" and verbally arguing over the phone the day of the shooting, subsequently agreeing to meet in the AutoZone parking lot to continue fighting. Also like in *Wolfe*, Ms. Richard saw Ms. Butler in the moments before the shooting and during the shooting: Ms. Richard testified that the two women were yelling at each other in the AutoZone parking lot prior to Ms. Butler shooting her, and Ms. Richard also testified that she saw Ms. Butler fire a gun at her. Thus, Ms. Richard's and Detective Roberson's testimony, as well as Officer Zeitoun's body-worn camera footage confirmed that Ms. Butler was no stranger to

Ms. Richard. Ms. Richard's identification of Ms. Butler as the shooter was buoyed by Detective Roberson's testimony that Ms. Richard never wavered in her identification of Ms. Butler; never expressed any hesitation in her identification; and never provided him with any reason to doubt her. Additionally, Detective Roberson stated that he never received any evidence that Ms. Butler was *not* the one who shot Ms. Richard.

Though Ms. Butler argues Ms. Richard's identification was insufficient because no other witnesses identified her as the shooter, we find no merit to this argument. In *Wolfe*, as summarized above, only one witness, Thomas, identified the defendant as the perpetrator. In fact in *Wolfe*, two other witnesses who were with the victim at the time of the incident affirmatively testified that the defendant was *not* the perpetrator and provided descriptions of the perpetrator that did not match the defendant's appearance. Yet, this Court explained that the district court judge found Thomas' testimony to be credible and found this sufficient to uphold the defendant's conviction. Here, Detective Roberson testified that he never received any evidence to the effect that Ms. Butler was not the shooter.

We also disagree with Ms. Butler's contention that the State provided no other evidence to support her identification as the shooter. The State introduced the 911 audio recordings into evidence; and, during the recording, Ms. Laneheart identified the shooter by the name "April," Ms. Butler's first name. Ms. Watson also testified that Ms. Richard told her immediately after the shooting that "April" shot her. Additionally, the State introduced into evidence the incident recall generated from the 911 phone calls, wherein the full name "April M. Butler" appears. Ms. Darby explained that this information was obtained when the 911 dispatcher ran the information and license plate provided regarding the shooter's

15

vehicle. Similarly, Detective Roberson testified that at the scene of the shooting someone showed to him a "picture of [the] license plate" on the shooter's vehicle, and investigators ultimately determined that the vehicle "was registered to" Ms. Butler.

Additionally, we disagree with Ms. Butler's characterization that Ms. Richard's testimony was "internally contradictory" because she "changed her story in an important respect after she viewed the video footage of the incident insofar as where the shooter was standing and the sequence of events leading to the shooting." Contrary to this characterization, we find that Ms. Richard remained consistent in testifying that she and Ms. Butler were yelling at each other before the shooting and that Ms. Butler stood on the passenger side of the vehicle prior to and during the shooting. Though Ms. Richard originally stated that Ms. Butler stood on the vehicle before firing the shots, Ms. Richard later clarified that she could not definitively recall if Ms. Butler stood on the vehicle; however, Ms. Richard remained steadfast in her testimony that Ms. Butler remained on the passenger side of her vehicle throughout the course of the incident. Moreover, we note that Ms. Richard's description of Ms. Butler's position is unrelated to the issue at hand – whether Ms. Butler was the individual who shot Ms. Richard twice.

Finally, in terms of the identification, Ms. Butler points to inconsistencies as to whether the shooter wore a mask and asserts that such inconsistencies call into question Ms. Richard's identification of Ms. Butler. Ms. Laneheart can be heard on Officer Zeitoun's body-worn camera footage stating that the shooter had some kind of mask on her face, and Ms. Watson testified that Ms. Laneheart also told her that the shooter wore a mask. However, Ms. Richard testified that the shooter "had something tied around her head" and never used the word mask. Ms. Richard never

16

indicated that the object tied around the shooter's head obstructed her view of the shooter's face. Rather, Ms. Richard was unequivocal in her identification of Ms. Butler as the shooter. Again, the jury found Ms. Richard to be credible and we are not to second guess such a rational credibility determination by the trier of fact.

Moreover, the State presented evidence that Ms. Butler specifically intended to kill Ms. Richard and committed an overt act in furtherance of that goal. As previously stated, specific intent can be inferred from the circumstances of the crime. Regarding the circumstances leading up to the shooting, as Ms. Richard testified, she and Ms. Butler had been "passing words" that day throughout the course of ten to fifteen phone calls, and Ms. Richard answered affirmatively that this constituted "an ongoing situation" when asked if she "and Ms. Butler had any beef or ill will in the past." Further, Ms. Richard testified that Ms. Butler came to the AutoZone that day having "agreed to come to fight [her]" and stated that the two women were yelling at each other in the AutoZone parking lot before the shooting commenced. During his testimony, Detective Roberson explained that his investigation revealed that Ms. Butler and Ms. Richard had been in a dispute over the phone earlier in the day on February 12, 2022, and "had gotten into an altercation" prior to the shooting. Similarly, while Officer Zeitoun's body-worn camera was recording, Ms. Laneheart stated that Ms. Richard and Ms. Butler had been engaging in back and forth phone calls with each other that day, and Officer Zeitoun summarized that the situation arose because "both [the shooter and the victim were] arranging to get into a physical altercation over a man" with whom "they were both involved." In sum, the testimony and evidence established that there existed a tense and acrimonious situation between Ms. Richard and Ms. Butler in the time leading up to the shooting.

17

Further, Ms. Richard testified that Ms. Butler pointed a deadly weapon, a gun, at her and fired numerous shots, thereby inflicting serious injuries and committing an overt act in furtherance of the crime of attempted manslaughter. Such actions on Ms. Butler's part, aiming a gun at Ms. Richard and firing it, support a finding of specific intent to kill according to the Louisiana Supreme Court's holding in *Seals*. 1995-0305, p. 6, 684 So.2d at 373 (first citing *State v. Williams*, 383 So.2d 369, 373 (La. 1980); and then citing *State v. Procell*, 365 So.2d 484, 492 (La. 1978)).

Additionally, in terms of the extent and severity of Ms. Richard's injuries, she explained that one bullet hit her right hip and another struck the middle of her stomach, causing her to black out; necessitating an approximately one-week long hospital stay; and requiring about two months of physical therapy to learn how to walk again.

In light of the above testimony and evidence, we conclude that any rational trier of fact could have found that the State proved beyond a reasonable doubt all of the elements of attempted manslaughter in its case against Ms. Butler, including her identity as the perpetrator. Thus, we find evidence to support the jury's conviction.

## DECREE

For the foregoing reasons, we affirm Ms. Butler's conviction for attempted manslaughter.

**AFFIRMED**